UNITED STATES of America, Plaintiff,

v.

Steven SNEED, Herman Graulich, and Brent Gundersen, Defendants.

Crim. No. 91–CR–122.

United States District Court, D. Colorado.

Feb. 19, 1993.

Gerald J. Rafferty and Kenneth R. Fimberg, Asst. U.S. Attys., Denver, CO, for plaintiff.

Marcella T. Clark, Lowery and Lowery, Lowery Suite, Denver, CO, for Sneed.

M. Kathryn Bradley, Denver, CO, for Graulich.

David A. Lane, Denver, CO, for Gundersen.

## MEMORANDUM OF SENTENCING HEARING AND REPORT OF STATEMENT OF REASONS

NOTTINGHAM, District Judge.

Counsel for the Government, defense counsel, and defendants were present for the sentencing hearing on January 22, 1993. The hearing thereafter continued on January 25, 1993, and February 11, 1993. Based on the hearing, the reports concerning presentence investigation of each defendant, and all other materials submitted to the court, I enter the following findings, conclusions, and orders:

1. Pursuant to rule 32(c)(3) of the Federal Rules of Criminal Procedure, each defense attorney and defendant was timely provided a copy of the report of the presentence investigation concerning that defendant (together with all addenda to the respective reports), excluding only the final recommendation as to sentence. No other information was withheld. Defendants and counsel have had the opportunity to read and discuss the presentence investigation reports.

2. Defendants and counsel were afforded the opportunity to speak, to present information in mitigation (or, in the case of the Government, aggravation) of the sentence, to comment on the reports, to introduce testimony or other information relating to any alleged inaccuracy in the reports, and to comment on the probation officer's determination and on other matters relating to the appropriate sentence.

3. The bulk of the evidence introduced at the hearing concerned the question of whether Mr. Graulich should receive an upward adjustment for obstruction of justice. The Government also introduced letters written by a prosecutor to Mr. Gundersen and Mr. Sneed concerning their possible cooperation in certain matters. Except as expressly noted otherwise in this memorandum, I have considered all evidence introduced at the sentencing hearing, all evidence produced during trial and pre-trial proceedings, and the facts recited in the presentence investigation reports (including all attachments and addenda) in imposing sentences in this case. Factual findings necessary to the resolution of disputes are summarized below.

## RESOLUTION OF FACTUAL DISPUTES AND DISPUTES CONCERNING APPLICATION OF GUIDELINES

DISPUTE CONCERNING APPLICABLE VERSION OF GUIDELINES

4. Congress has provided by statute that a sentencing court is ordinarily to apply the guidelines in effect on the date a defendant is sentenced. 18 U.S.C.A. § 3553(a)(4), (5) (West 1985 & Supp.1992). *See also* U.S.S.G. § 1B1.11(a) (Nov. 1992). The statute, however, is limited by the operation of the *Ex Post Facto* Clause, which "prohibits retroactive application of a changed guideline if the change disadvantages the defendant." *E.g., United States v. Saucedo*, 950 F.2d 1508, 1513 (10th Cir.1991) (citation omitted).

5. In making its offense computations in this case, the probation department did not use the current version of the guidelines. Instead, it used the *United States Sentencing Commission Guidelines Manual* which took effect on November 1, 1989, evidently on the ground that some aspects of the fraud guidelines were revised after the offenses charged here had been committed. Observing that section 2F1.1(b)(1) was amended on November 1, 1989, to provide more severe adjustments in offense levels for fraudulent schemes where the loss exceeds $40,000, Mr. Sneed objects to the probation department's use of the 1989 guidelines manual and main-

tains that application of the amendments in his case would violate the *Ex Post Facto* Clause of the United States Constitution. *See* U.S.S.G. App. C, amend. 154 (Nov. 1989) (juxtaposing old loss table and amendments effective on Nov. 1, 1989). He urges that I use the 1988 version of the guidelines.

6. Here, retroactive application of the guideline amendments which took effect on November 1, 1989, would plainly disadvantage Mr. Sneed, assuming that I were to attribute to him a loss exceeding $40,000. The issue is whether use of the 1989 amendments amounts to retroactive application of those amendments. The probation department suggests that there is no issue concerning retroactivity because relevant conduct for which Mr. Sneed is responsible occurred *on or after* November 1, 1989. Specifically, the probation department observes that "on November 1, 1989, defendant Sneed wired $6,615.21 from a brokerage account with J.W. Gant (monies set aside to purchase Monarch stock) to an account in his name at Rigg's National Bank of Virginia in Alexandria." *Second Addendum to the Presentence Report (Sneed)* at A–2.

7. I do not think the evidence introduced at trial supports inclusion of Mr. Sneed's act on November 1, 1989, as part of his "relevant conduct." The SEC suspended all trading in the fraudulent Monarch stock on October 13, 1989. Although the Superseding Indictment alleged a securities fraud scheme which extended to October 19, 1990, I find by a preponderance of the evidence that the fraudulent manipulation ended on October 13, 1989, and was never resumed. Mr. Sneed could not have reasonably foreseen the two isolated acts of co-conspirators which allegedly occurred after suspension of trading. Therefore, all acts for which Mr. Sneed was responsible were complete on October 13, 1992. "Relevant conduct," under all present and past versions of the guidelines, includes acts "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1) (Nov. 1992). *See also, e.g.,* U.S.S.G. § 1B1.3(a)(1) (Nov. 1988). I am satisfied that Mr. Sneed's opportunistic misappropriation of funds set aside for additional manipulations of the Monarch stock was a separate, subsequent legal wrong which did not occur during commission of the offense of conviction, since the securities fraud had already ended and was never resumed. I also do not believe that the funds were misappropriated in an attempt to avoid detection of the fraud. Mr. Sneed took the money because he was desperate for funds and knew (as the Government observes) that the FBI agent posing as a stock manipulator was hardly in a position to complain. Based on the finding that Mr. Sneed's relevant conduct was complete before November 1, 1989, I conclude that use of an amendment effective as of that date would be a prohibited *ex post facto* application of the amendment. I therefore apply the 1988 fraud table. *See* U.S.S.G. § 2F1.1(b) (Nov. 1988). In addition, consistent with the sentencing commission's so-called "one book" rule, I will use the 1988 version of the guidelines manual on other issues as well. *See* U.S.S.G. § 1B1.11(b)(2) (Nov. 1992). I will refer to later versions of the guidelines only where the later version clarifies the earlier guideline. *Id.*

DISPUTES CONCERNING CALCULATION OF AMOUNT OF LOSS

*General Findings and Conclusions*

8. The guideline for offenses involving fraud or deceit requires the sentencing court to adjust the base offense level by raising the level in increments corresponding to the amount of "loss" involved. *See* U.S.S.G. § 2F1.1(b) (Nov. 1988). This case presents an issue which is apparently one of first impression: how should a court determine the amount of loss where the fraud convictions result from an undercover "sting" operation set up by the Government? Because the Government carefully controlled the undercover "sting" operation here so as to avoid inflicting an actual loss on anyone, defendants argue that no loss adjustment is appropriate.

9. A jury has found defendants guilty of securities fraud, mail fraud, and wire fraud based on defendants' involvement in putting

together a nearly-worthless corporation and then manipulating the price of its shares upwards through a series of controlled trades. An undercover FBI agent posed as an unscrupulous businessman who was interested in acquiring a worthless "shell" corporation, increasing the apparent value of the corporation's shares by manipulation, and offering the spuriously-valued shares as security for a bank loan which he wanted to obtain. As the undercover operation progressed, the undercover agent was introduced to Mr. Sneed, then to Mr. Gundersen, and finally to Mr. Graulich. Each defendant became involved in some aspect of the scheme.

10. One of the rules which the Government established for its undercover operation was that none of the nearly-worthless shares would ever be sold to a member of the public. The Government therefore faced a problem: if no shares were to be sold to the public, what was the undercover agent supposedly trying to accomplish in manipulating the price of the stock? This problem begat the ruse that the undercover agent wanted to present the stock, at its spuriously-inflated value, to secure a loan of $3,000,000 from an off-shore bank.

11. The exact identity of the person or persons who hatched the bank-loan ruse and devised the curious terms of the loan transaction is obscure. It is clear, however, that the terms were invented by a Government agent, official, and/or informer, not by any defendant. Because the terms of the loan have some potential significance in determining the amount of loss, they must be summarized here.

12. The loan which the schemers supposedly sought was in the amount of $3,000,000. *Government Ex. 1–2H.* The bank, however, was not going to disburse this entire amount to the schemers. It was to retain $810,000 as a reserve to secure three-years worth of interest. With $680,000, it was to purchase some sort of annuity contract. The purpose of the annuity contract is unclear; it was either to constitute additional security for the loan, or the proceeds of the annuity were to be used to repay the loan. For some reason, the bank was to retain $40,000 to "recover expenses for purchase of [the] shell." *Id.*

Thus, the "net proceeds disbursed to [the] borrowing group" would be only $1,470,000; the bank was to have control of the rest.

13. Based on these facts, the parties advance various alternatives for calculating the amount of loss. The Government alone suggests several possibilities. The most extreme possibility assumes that the schemers intended to manipulate all 17,500,000 issued shares of Monarch (the shell corporation) to the target price, $1.19 per share. This assumption results in an "intended loss" calculation of $20,825,000. The "intended loss" figure actually advocated by the Government, however, is $350,907. This figure is based on the written trading schedule devised by Mr. Sneed, revised by Mr. Graulich, and shown to Mr. Gundersen. The trading schedule called for manipulation of 294,880 shares to a target price of $1.19—for a "loss" of $350,907.

14. I do not believe any of the possibilities advanced by the Government represent an appropriate calculation of actual, intended, or probable loss. All of these possibilities are the product of a certain number of nearly-worthless shares multiplied by the price at certain stages of the manipulation. Such a calculation might be plausible if the valueless shares had gotten into the hands of the public at some point or if any of the schemers had *intended* for the shares to get into the hands of the public, for such a calculation would accurately measure the loss of anyone who invested in the stock. This, however, is not the case, for none of the schemers intended to defraud the investing public. Neither the undercover agent nor any defendant intended for the shares to reach the public. The object of the manipulation, rather, was to use the spuriously-valued stock as collateral for the bank loan. I am satisfied from evidence produced at trial that both Mr. Gundersen and Mr. Graulich were aware of this general object of the loan, although they did not know the amount or terms of the loan. Mr. Sneed was aware of the specific terms summarized in paragraph 12. In these circumstances, the only "loss" which any defendant could conceivably have intended would be loss to the bank caused by its receipt of nearly-worthless collateral; the investing public suffered no loss.

15. Any attempt to use the bank loan as a basis for calculating loss engenders another series of problems. As to Mr. Graulich and Mr. Gundersen, neither of whom knew the precise amount or terms of the loan, the primary problem is the amount of loss to be attributed to each defendant. Taking comfort from U.S.S.G. § 2F1.1, comment (n. 8) (Nov. 1988) ("The amount of loss need not be precise.... The court need only make a reasonable estimate of the range of loss, given the available information."), the probation department begins with the unassailable proposition that each defendant knew how much money he was to make in the scheme. The department then theorizes as follows: (1) Both Mr. Gundersen and Mr. Graulich must have known that Mr. Sneed, who put the entire operation together, was making more than them. (2) Mr. Graulich knew how much Mr. Gundersen was making, since they had done business in the past. (3) Other persons were involved in the scheme and had to be paid. (4) Based on these circumstances, both Mr. Gundersen and Mr. Graulich must have known that the undercover agent's expenses to execute the scheme would be at least $100,000. (5) Mr. Gundersen and Mr. Graulich could reasonably assume that the agent would have made at least as much as his total expenses. The probation department thus recommends a loss figure of $200,000 for both defendants. Without dissecting each of the department's factual inferences, I simply state that I do not believe they permit me to establish "a reasonable estimate of the range of loss" by a preponderance of the evidence.

16. Any attempt to use the bank loan as a basis for calculating loss in Mr. Sneed's case poses a separate set of problems. As an initial matter, it is clear that the gross face amount of the loan, $3,000,000, is not an appropriate measure. *United States v. Smith*, 951 F.2d 1164, 1167 (10th Cir.1991); *United States v. Kopp*, 951 F.2d 521, 529 (3d Cir.1992). This figure must, at a minimum, be reduced by reserves which the bank was supposed to retain. This reduction leads to a calculated sum of $1,470,000.

17. As Mr. Sneed observes, even the $1,470,000 figure is problematic. The primary problem stems from the fact that the Government has not adequately explained the terms of the fabricated bank loan. Surely the bank would have earned some interest on the money reserved, thus reducing the probable loss by some undetermined amount. Mr. Sneed goes so far as to claim that there was no contemplated loss to the bank, because the loan was to be repaid with the proceeds of the annuity which the schemers were supposedly purchasing. I find it implausible that a $3,000,000 bank loan could be repaid, within any reasonable period, by the proceeds of a $680,000 annuity, but Mr. Sneed's argument does underscore the difficulty with using the loan as a basis for establishing a range of loss. Indeed, there is something surrealistic in talking about "loss" on a loan which was bogus *ab initio*.

18. After considering the various positions of the parties in light of recent case law, I have concluded that the correct loss figure in an undercover "sting" operation—at least one structured as this one was—is zero. I reach this conclusion for several reasons. This first has to do with the very purpose of employing the concept of "loss" in sentencing an offender. Congress has mandated that the sentencing commission consider "the nature and degree of the *harm caused* by the offense" in formulating the sentencing guidelines. 28 U.S.C.A. § 994(c)(3) (West Supp. 1992) (emphasis supplied). For theft, fraud, and similar offenses, "loss" is deemed relevant to sentencing "because it is an indicator of both the *harm to the victim* and the gain to the defendant." U.S.S.G. § 2B1.1, comment (backg'd) (Nov. 1988) (emphasis supplied).

19. Both the statute and guideline cited in the previous paragraph seem to be talking about actual harm to a victim (or actual gain to a defendant) as the relevant sentencing consideration. Using this concept entails little difficulty where the crime is executed as conceived, for there is then no real difference between the actual result and the conceived result: the owner has been permanently deprived of property; and the measure of harm to the owner is the value of the property, estimated by some objective means such as fair market value or replacement cost. *See*

U.S.S.G. § 2B1.1, comment (n. 2) (Nov. 1988). It matters not that the thief had every intent to take $1,000 but only got $500, that he mistakenly thought a $20,000 car was worth $40,000, or that he intended to steal table wine but ended up with a rare and valuable vintage. Harm in each of these cases is measured by objective worth to a victim, *id.*, not by what a defendant knows, thinks he knows, intends, or imagines. The guidelines treat this concept as "actual" loss.

20. Of course, crimes are not always executed as conceived. The crime may be detected before it is completed, so that it never gets beyond the attempt or conspiracy stage. If it is completed, the police may interrupt it before the defendant accomplishes all the harm originally conceived. The police may recover the fruits of the crime, thereby frustrating a defendant's purpose to keep the misbegotten property for his own benefit. Any number of largely-fortuitous circumstances may intervene to create a gap between conception and full execution of the crime.

21. The guidelines refer to this gap between conception and full execution as "partially completed conduct." U.S.S.G. § 2B1.1, comment (n. 2) (Nov. 1989). "Loss" in such cases is to be determined "in accordance with the provisions of 2X1.1 (Attempt, Solicitation or Conspiracy). *E.g.,* ... if a defendant is apprehended in the process of taking a vehicle, the loss refers to the value of the vehicle even if the vehicle is recovered immediately." *Id.* The focus is on the actual *risk* of harm, and the defendant does not benefit from the fact that a fortuitous circumstance beyond his control intervenes to minimize or prevent that harm. Consistent with this policy on attempts, the fraud guideline introduces the confusing terms "probable" loss and "intended" loss: "[I]f a probable or intended loss that the defendant *was attempting to inflict* can be determined, that figure would be used if it was larger than the actual loss." U.S.S.G. § 2F1.1, comment (n. 7) (Nov. 1988) (emphasis supplied).

22. The use of the term "intended" loss in the fraud guideline is confusing and unfortunate, because it invites the sentencing court to focus exclusively on a defendant's knowl-edge or subjective intent in establishing a loss figure for fraud offenses. I do not think that is the sentencing commission's purpose. The point can be made more clearly by returning momentarily to the theft guideline. Suppose, for example, that a defendant is apprehended in the process of stealing a $20,000 car which he mistakenly thinks is worth $40,000. His subjective intent, undoubtedly, is to inflict a loss of $40,000, but the car is fortuitously recovered and there is no actual harm to the victim. The correct calculation of loss is $20,000, the objective fair market value of the property in the real world. *See* U.S.S.G. § 2B1.1, comment (n. 2) (Nov.1988). Defendant's subjective intent to inflict a greater (or lesser) loss is irrelevant. So is the fact that the car was recovered, for the loss is calculated as though defendant had perfectly executed the crime which he originally conceived. In the case of partially-completed conduct, loss is measured not by a defendant's subjective intent to cause loss in a given amount or by any mistaken knowledge which he possessed, but by the *objectively-measured harm* which his conduct would probably have caused the victim in the natural course of events, had the conduct not been fortuitously interrupted.

23. Similarly, when the sentencing commission uses the term "intended" loss in the fraud guideline, I think it means only the objectively-measured loss which the conduct would probably have caused a victim in the natural course of events. This conclusion is supported by the declaration that use of "intended" loss is "[i]n keeping with the Commission's policy on attempts," U.S.S.G. § 2F1.1, comment (n. 7) (Nov. 1988), thus suggesting that use of the term is nothing more than an application of the "partially-completed conduct" rule stated in the theft guideline. *See* U.S.S.G. § 2B1.1, comment (n. 2) (Nov. 1989). It is further supported by the fact that the guideline speaks of "intended or probable loss," thus suggesting that these are to be regarded as separate but related concepts. I therefore conclude that it would be a misapplication of the guidelines here to focus exclusively on the loss which defendants subjectively thought they were inflicting and to omit any inquiry about the

loss which defendants' activities would probably have caused a victim in the natural course of events.

24. This interpretation of the term "intended" loss is supported by the decisions in *United States v. Santiago*, 977 F.2d 517, 524 (10th Cir.1992) and *United States v. Kahn*, 969 F.2d 218 (6th Cir.1992). In *Santiago*, defendant submitted to his insurance company a false claim seeking $11,000 in payment for his allegedly-stolen car. It was plain that he had a subjective intent to defraud the insurance company out of $11,000. The "blue book" value of the car, however, was $4,800, and this was the highest amount the insurance company would have paid under its policy had the fraud succeeded. The court rejected the lower court's use of the $11,000 figure, holding that, "whatever a defendant's subjective belief, an intended loss under ... [section] 2F1.1 cannot exceed the loss a defendant in fact could have occasioned if his or her fraud had been entirely successful." 977 F.2d at 524. Focusing on the disjunctive language "probable or intended loss" and noting that these terms are not necessarily the same, the court stated that the loss subjectively intended by a defendant should not be used "when the economic reality is that the probable or actual loss *could not in any circumstances* have exceeded a discernable lesser amount." *Id.* (emphasis supplied). *See also United States v. Schneider*, 930 F.2d 555, 556, 559 (7th Cir.1991) (stating that loss calculation must be based on economic reality and noting that gravity of an interrupted fraudulent scheme "depends in significant degree on the size of the loss that would have been inflicted had the scheme not been interrupted").

25. Similarly, in *Kahn*, defendant and his spouse, falsely claiming that defendant had died, fraudulently sought survivors' benefits from the Social Security Administration. The Social Security Administration failed to detect the fraud but denied benefits on the separate ground that the "deceased" had not worked a sufficient number of quarters for his family to be eligible for survivors' benefits. On such facts, the Sixth Circuit found that there was no possibility of any actual loss "for reasons entirely unrelated to the fraud or its discovery" and rejected the district court's upward adjustment of the offense level. 969 F.2d at 220. The court found this result consistent with numerous cases where courts permitted use of a loss which defendant was attempting to inflict because "those cases all involve a context of fraudulent schemes that *could result* in an actual loss, and they have underlying them a presumption that actual loss was possible if the deception entailed in the fraud succeeded." 969 F.2d at 221 (emphasis supplied). *But see United States v. Lghodaro*, 967 F.2d 1028, 1031 (5th Cir.1992) (court affirmed loss figure based on amount of fraudulent claims submitted to insurance companies, rather than amount actually paid out by companies, without discussing whether it was realistically possible for "probable" loss to have exceeded companies' actual loss); *United States v. Davis*, 922 F.2d 1385, 1392 (9th Cir.1991) (affirming loss calculation based on market value of jewels which defendant fraudulently attempted to obtain and rejecting defendant's factually-unsupported argument that the attempt could not have succeeded because of a custom among jewelers that buyers such as he were expected to personally inspect the jewels prior to shipment).

26. The rule which seems to emerge from these and other cases is that use of "intended" loss as a measure of harm under section 2F1.1 is limited by a requirement that a sentencing court examine the circumstances objectively to see whether it was realistically possible for defendant to inflict the intended loss. In circumstances where it is realistic to expect that defendant could have inflicted the intended loss, then the "intended" loss figure should be used, even if (for example) the police intervene to prevent or diminish the intended loss. *E.g., United States v. Westmoreland*, 911 F.2d 398, 399 (10th Cir.1990). Where the scheme could not possibly have resulted in the intended loss under any circumstances, then "intended" loss should not be used. *Santiago*, 977 F.2d at 524; *Kahn*, 969 F.2d at 220–21.

27. While this undercover operation does not fit squarely within the facts of *Santiago* or *Kahn*, I am satisfied that the operation

presented no real possibility of any loss to a victim, regardless of what defendants intended. It was not merely that the Government intervened at an inchoate stage of an existing scheme or that it interrupted a crime to diminish the intended loss; it exercised such control over the scheme, from beginning to end, that no loss was ever possible to real investors or real banks. It is not a question of "economic reality" but a question of simple reality. Applying the principle of *Santiago* and *Kahn,* I conclude (1) that there was no real possibility of any actual loss in this scheme and (2) that the proper loss figure is therefore zero, regardless of defendants' subjective intent. I believe, however, that a dollar loss figure of zero does not adequately capture the seriousness of defendants' conduct. I will therefore consider a departure under the authority of U.S.S.G. § 2F1.1, comment (n. 9) (Nov. 1988). The departure is discussed in a later section of this memorandum.

28. The Government's underlying control of the scheme brings me to the final reason for applying a "zero" loss adjustment. In an undercover operation structured as this one was, the "intended" loss is almost invariably a product of the officials' collective imagination. As noted, the amount and bizarre terms of the fictitious bank loan were made up entirely by the Government. Indeed, although none of the schemers seems to have considered the matter, I find it improbable that any real bank would have been taken in by the scheme, even if I make due allowance for the gullibility of some banks. The amount could just as easily have been $6,000,000, and the undercover agent could have made sure that each defendant was aware of the specific amount. If "intended" loss were the proper measure of harm, then the Government's law enforcement agents would effectively control this offense characteristic. I see no reason for the court to perpetuate this make-believe world in sentencing by using a loss figure which is essentially fictional.

*Findings and Conclusions Concerning Sneed's and Graulich's Additional Contentions Regarding Loss*

29. Mr. Sneed's first argument is that the court must determine loss solely by looking to the amount which the Government actually paid him during the course of the undercover operation—$7,097.66. Based on an identical contention, Mr. Graulich claims that the loss in his case is $8,000, the amount which he was paid. I address the argument, even though the "zero" loss figure is more favorable to defendants, because of my decision to depart upward on the ground specified in a later section of this memorandum.

30. I decline, for two reasons, to calculate loss according to the amount which the Government actually paid each defendant. First, the Government was not a "victim" which relied on defendants' fraud and was thereby harmed. It paid each defendant willingly and knowingly, as a part of the cost of the undercover operation. Second, use of this figure would result in a loss calculation based on the amount which had actually been paid each defendant when the SEC suspended trading, a calculation which is largely fortuitous. For example, the loss attributed to Mr. Gundersen would be $30,000 because he had performed most of the tasks required of him, and had been paid accordingly, at the time the SEC suspended trading. This is not a realistic evaluation of each defendant's part in the plot, and I find nothing in the guidelines to recommend this approach.

31. Mr. Sneed next contends that he is entitled to a three-point reduction under section 2X1.1 of the guidelines, on the theory that completion of the fraudulent scheme was interrupted when the SEC suspended trading in Monarch stock. I decline to award the reduction, for two reasons. First, section 2X1.1 applies when the offense of conviction is attempt, solicitation, or conspiracy. Defendant has not been convicted of any such offense. Second, even if section 2X1.1 were applied (on the theory that securities fraud, wire fraud, and mail fraud are jointly-undertaken crimes akin to conspiracy), defendant would not be entitled to the reduction if he "or a coconspirator completed all the acts the conspirators believed necessary on their part for successful completion of the substantive offense *or* the circumstances demonstrate that the person was about to complete all such acts but for apprehension or interrup-

tion by some similar event beyond their control." U.S.S.G. § 2X1.1(b)(2) (Nov.1988) (emphasis supplied). Here, defendants had already committed all elements of mail fraud and wire fraud before the SEC suspended trading in Monarch stock. Indeed, it was only the SEC's action which prevented them from reaching their ultimate goal of inflating the stock's value to a point where it could be used as security for the bank loan. These facts do not support the claimed three-point reduction.

## DISPUTE CONCERNING MORE THAN MINIMAL PLANNING (SNEED AND GRAULICH)

■ 32. Mr. Sneed and Mr. Graulich argue that it was the FBI, not defendants, who concocted this entire scheme. They thus urge that there should be no two-point adjustment for more than minimal planning. The argument is without merit, because each defendant willingly involved himself in the scheme, regardless of its origins. " 'More than minimal planning' is deemed present in any case involving repeated acts over a period of time, unless it is clear that each instance was · purely opportune." U.S.S.G. § 1B1.1, comment (n. 1[f] ) (Nov.1988). Mr. Sneed undertook numerous acts to further the scheme: he devised the phony trading schedule; he met and spoke with Mr. Gundersen and Mr. Graulich; and he was involved in trading the stock. These acts began in January 1989 and extended through October 1989. They demonstrate systematic, intricate involvement. Mr. Graulich likewise undertook numerous acts: he revised and refined the phony schedule so as to minimize the possibility of detection; he spoke with Mr. Sneed and the undercover agent on a number of occasions; and he also was involved in trading the stock.

33. Mr. Sneed also relies on the application note defining "more than minimal planning" as "more planning than is typical of the offense in a simple form." *Id.* He suggests that the planning which he undertook was typical of a simple securities offense. For the reasons stated in the previous paragraph, I disagree with the factual premise that his involvement reflected nothing more than a simple form of securities fraud. A broker who makes a knowing representation in the course of a single trade of a stock commits securities fraud in its simplest form. One needs to travel a considerable distance along the spectrum from simplicity to complexity before one encounters Mr. Sneed's activities on the spectrum.

## DISPUTES CONCERNING ROLE IN OFFENSE

### Sneed

■ 34. Mr. Sneed concedes, and I find, that the fraudulent scheme here involved five or more participants. *See* U.S.S.G. § 3B1.1, comment (n. 1) (Nov.1988) (defining "participant" as one who is criminally responsible for commission of the offense). Those participants included Mr. Sneed, Mr. Gundersen, and Mr. Graulich. They also included the persons who entered pleas of guilty to the securities fraud charges: Messrs. Fisher, Schwartz, Fitzpatrick, and Weber. Mr. Sneed argues, however, that he was not an organizer, leader, manager, or supervisor. I find that he was an organizer or leader and thus adjust his offense level by four points.

35. The guidelines enumerate the things which a court should consider in deciding whether a defendant is an organizer or leader (meriting a four-point adjustment), as opposed to a manager or supervisor (meriting a three-point adjustment). They include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment (n. 3) (Nov.1988). Mr. Sneed, unlike the other defendants and participants, knew the full scope and object of the complicated plot proposed by the undercover agent. He was nothing less than the undercover agent's right-hand man at every stage of its execution: he participated in meetings with Mr. Gundersen concerning acquisition of the "shell" company; he worked with Mr. Graulich to refine the trading plan; he participated in the transactions by which the stock was manipulated. Indeed, he invented the detailed plan to manipulate the stock. He con-

cocted the bogus business plan of Monarch, without assistance from the agent or anyone else. He arranged for Harold Fisher to act as one of the market makers. He effectively controlled Peter Schwartz, one of the "nominees" used to trade the stock. His fee of $147,000 (ten percent of the net loan amount) was the largest share of the fruits of the crime. He "controlled" the scheme in the sense that the plan devised by him was the blueprint from which all the participants were reading, even though he did not dictate details concerning the other defendants' day-to-day performance of their roles. All of these circumstances support the inference that he was an organizer or leader of the scheme. It should be noted that, even if the undercover agent could be regarded as an organizer or leader (as Mr. Sneed contends), there can be more than one person who qualifies as an organizer or leader. *Id.*

### Gundersen

36. Mr. Gundersen also urges that he should not be treated as an organizer, leader, manager, or supervisor of an activity involving five or more participants. The Government insists that he was an organizer or leader. I adopt the intermediate position that he was a manager or supervisor.

37. Mr. Gundersen argues that the "shell factory" which he was accused of running did not involve five or more "participants," defined as persons "criminally responsible for the commission of the offense." U.S.S.G. § 3B1.1, comment (n.1) (Nov.1988). He also urges that the "shell factory" was not otherwise extensive when one considers only the "factory" workers who were criminally responsible. I agree, because I cannot find by a preponderance of the evidence that anyone except Mr. Gundersen and Eldon Weber were criminally culpable in the organization and operation of the "shell factory." *Cf. United States v. Litchfield*, 959 F.2d 1514 (10th Cir.1992) (should not count "unwitting investors" in applying enhancement). Although the "shell factory" employed numerous people (and could thus be regarded as "otherwise extensive"), the Government has failed to demonstrate the *criminal* responsibility of these other persons.

38. There is a more fundamental problem in treating Mr. Gundersen as an organizer or leader: in evaluating Mr. Gundersen's role it is important to distinguish his role in putting together shell corporations from his role in the stock manipulation. Although the guidelines have been amended, *see* U.S.S.G. App. C ¶ 345 (Nov.1992), the law of this circuit at the time of defendants' conduct was that role-in-the-offense adjustments were to be determined by examining a defendant's role in the offense of conviction, not his role in "other criminal conduct." *United States v. Pettit*, 903 F.2d 1336, 1341 (10th Cir.1990). The offenses of conviction here consist of the stock manipulation and the specific acts of mail fraud and wire fraud committed in furtherance of that manipulation. I therefore focus on Mr. Gundersen's relation to the overall stock manipulation scheme, not his relation to the "shell factory," in determining his role.

39. Maintaining this focus, I am satisfied that Mr. Gundersen could not be regarded as "an organizer or leader" of the overall stock manipulation scheme. In so deciding, I once again apply the criteria outlined in U.S.S.G. § 3B1.1, comment (n. 3) (Nov. 1988). Mr. Gundersen knew that the undercover agent, Mr. Sneed, and others intended to use his "boxed" shell in a stock manipulation. He knew that the general object of the manipulation was to use the stock to secure a bank loan. He saw Mr. Sneed's trading schedule and commented, "It looks great!" He did not, however, control the manipulation or participate in it directly. He did not revise or refine the trading schedule. He supervised only one accomplice (Eldon Weber). Unlike Mr. Sneed, he cannot be said to have prepared a plan which controlled the course of events.

40. If Mr. Gundersen were not an "organizer or leader," could he nonetheless be characterized as a "manager or supervisor"? *See* U.S.S.G. § 3B1.1(b) (Nov.1988). While the guidelines provide explicit direction concerning the factors which separate an "organizer or leader" from a "manager or supervisor," they are less helpful in distinguishing a "manager or supervisor" from others who are lower in the organization. They do say

that the section as a whole is intended to provide a "range of adjustments" based in part on "the degree to which the defendant was responsible for committing the offense." U.S.S.G. § 3B1.1, comment (backg'd) (Nov. 1988). I therefore infer that the "manager or supervisor" adjustment can be applied where a defendant meets the criteria enumerated in U.S.S.G. § 3B1.1, comment (n. 3) (Nov. 1988) to some unspecified lesser degree than other plotters.

■ 41. I am convinced that Mr. Gundersen can be treated as a manager or supervisor. He did not have decision-making authority which extended through the entire fraudulent scheme, but he did have final decision-making authority over a vital branch or division of the operation—the assembly and sale of the phony "shell" corporation. He surely "supervised" and controlled one accomplice, Eldon Weber. He organized the "shell" production in the overall operation. He secured a broker (Pandolfo) to list the stock in the "pink" sheets published by the National Quotations Bureau. When the SEC suspended trading and the conspirators feared investigation and detection, it was Mr. Gundersen who assured them that the paper corporation could withstand scrutiny. While Mr. Gundersen's claimed share of the proceeds was not as large as Mr. Sneed's, it was larger than anyone else's. Although Mr. Gundersen favorably likens himself to those defendants who acted as "nominees" of Mr. Sneed and the undercover agent in manipulating the stock, the foregoing facts all serve to distinguish him from such persons. In effect, if the entire plot is viewed as an organization, Mr. Gundersen is properly characterized as a production manager. I therefore treat him as a manager or supervisor and adjust his level by three points.

### Graulich

■ 42. In terms of the criteria specified in U.S.S.G. § 3B1.1, comment (n. 3) (Nov. 1988), Mr. Graulich was in some ways less culpable than Mr. Gundersen; in some ways he was more culpable; in some ways he was the same. All things considered, I find that he merits the same intermediate "manager or supervisor" adjustment meted out to Mr. Gundersen. Like Mr. Gundersen, Mr. Graulich knew that the general object of the manipulation was to use the stock to secure a bank loan. He was less culpable than Mr. Gundersen, in that (1) his claim to a share of the proceeds, was significantly less than Mr. Gundersen's ($10,000 for Mr. Graulich, as opposed to $40,000 for Mr. Gundersen), and (2) there was no single criminal actor who reported directly to him as a boss in a chain of command. He was more culpable than Mr. Gundersen, however, in that he was at the heart of the manipulation scheme and exhibited considerable sophistication on the question of how to control trading of the stock so as to minimize the possibility of detection. He revised and refined Mr. Sneed's trading schedule; he directed the market makers during the manipulation; he spoke to one of the "nominee" sellers (who was really a second undercover agent using the name "Michael Moss") concerning how to conduct himself if there were any investigation. At one point, it was even suggested that the schemers could contact him in the event that they could not reach the primary undercover agent. In the control of the actual manipulation, his activity was second only to Mr. Sneed's. A three-point "manager" adjustment is warranted.

### Disputes Concerning Obstruction of Justice (Graulich)

43. The proposed adjustment for obstruction of justice raises the issue of whether Mr. Graulich provided materially-false information to the magistrate when submitting a Criminal Justice Act form (CJA 23) requesting the appointment of counsel. See U.S.S.G. § 3C1.1, comment (n. 1[c]) (Nov. 1988). Two allegations are made. First, Mr. Graulich allegedly understated the amount of money he had in a checking account at City National Bank in Miami, Florida. Second, Mr. Graulich allegedly failed to disclose his interest in a checking and trading account carried under the name "Mattessa" (a combination of the names "Matthew" and "Vanessa," Mr. Graulich's grandchildren).

### The City National Bank Issue

44. I am satisfied that this issue is the product of a mistake, and I find that Mr.

Graulich accurately disclosed all requested information about the checking account. In response to the printed question, "Have you any cash on hand or money in savings or checking account?" Mr. Graulich checked the "yes" box and disclosed a total amount of $500. The account statement from City National Bank for April *1991* discloses a balance of $68.46 on April 29, 1991, the date Mr. Graulich submitted his affidavit to the magistrate. The contrary information in paragraph 27 of the presentence report is based on erroneous information furnished the probation department by City National Bank (the statement for April of *1990*) and I expressly reject that information.

*The Mattessa Issue*

45. Documentation concerning the Mattessa stock trading account (with Pacific International Securities, Vancouver, British Columbia) discloses that it was opened for Mattessa, Inc., a corporation. Officers were Eleanor Graulich (defendant's wife), president, and Laurie Graulich (defendant's daughter), vice president. Eleanor and Laurie were the persons who had written authorization to execute trades on the account. There is no suggestion that the documents or signatures are forged. I therefore find that the documents and signatures are regular and genuine.

46. The Government nonetheless argues that Mr. Graulich effectively controlled this account and suggests that Mattessa, Eleanor, and Laurie were nothing more than his nominees. It relies primarily on statements made by Bruce Stratton, a broker at Pacific International Securities. Mr. Stratton did not appear to testify under oath, and the Government instead introduced the testimony of a law enforcement agent concerning Mr. Stratton's statements to the agent and other law enforcement officials. Mr. Stratton told these persons that it was Mr. Graulich, not anyone else, who executed trades on this account.

47. Not to be outdone by the Government's bent for hearsay evidence, Mr. Graulich rebutted the agent's testimony by introducing statements which Mr. Stratton made to an investigator appointed to assist his counsel. Mr. Stratton told this investigator that Eleanor Graulich was the only authorized trader. Stratton suggested that he had been mistaken in his earlier statements because he was not directly involved with this account.

48. The only finding which can be made, by a preponderance of the evidence, is that Mr. Stratton, the person with first-hand knowledge, has apparently contradicted himself. (Mrs. Graulich did testify, on behalf of her husband, that it was she alone who was authorized to trade and who did trade; but putting her on the stand was a tactical mistake, for she revealed substantial ignorance concerning trades on the account.) Even if I could find that it was Mr. Graulich who executed trades on the account, this fact would be too inconclusive to establish that the account was really Mr. Graulich's and that he lied when failing to disclose it. True, that is an inference which could be drawn; it would be equally plausible, however, to suppose that Mr. Graulich executed trades with Mrs. Graulich's implied authority. The paperwork suggests that Mattessa is a separate corporate entity, and the Government has not produced evidence sufficient to justify treating Mattessa's assets as Mr. Graulich's. On this record, then, I reject any finding that Mattessa's assets are really Mr. Graulich's or that he lied to the magistrate by failing to disclose them.

49. Mr. Graulich has also moved to strike paragraphs 27 through 30 of the presentence report, the paragraphs setting forth the facts concerning the proposed obstruction-of-justice adjustment. I have already rejected the facts which I think are unsupported by a preponderance of the evidence. My finding and conclusions are going to be furnished to the United States Bureau of Prisons; indeed, the probation department's standing instruction is that they are attached to the front of all copies of presentence reports. I expect that the United States Bureau of Prisons, in executing the sentence, will follow this memorandum, not the presentence report, when there is a variance between them. To strike the paragraphs and require preparation of a new report omitting matters to which I have referred in this memorandum would be un-

necessary and confusing. The motion is therefore denied.

DISPUTES CONCERNING ACCEPTANCE OF RESPONSIBILITY

### General

50. The first issue is whether each defendant should be denied the reduction for acceptance of responsibility on the ground that he "put[ ] the government to its burden of proof at trial by denying the essential factual elements of guilt, [was] convicted, and only then admit[ted] guilt and express[ed] remorse." U.S.S.G. § 3E1.1, comment (n. 2) (Nov. 1992). Based on the strategy pursued at trial and on the motions filed by defendants, I find that they, in part at least, took the matter all the way to trial so that they could preserve the issue of whether the indictment should have been dismissed because of excessive governmental involvement in the activities underlying the indictment. Indeed, I reserved ruling on the motions to dismiss until the conclusion of the trial, reasoning that the full extent of the Government's involvement could be fully assessed only at the trial on the merits. Defendants' exercise of the fundamental constitutional right to a trial does not, therefore, preclude the adjustment.

### Sneed

51. I have considered Mr. Sneed's extensive handwritten statement and his comments at sentencing. He truthfully admits his own involvement in the scheme; in light of the tapes and documents introduced at trial, he could hardly do otherwise. When confronted by the FBI after the operation had ended, he was apparently willing to cooperate with the Government in its investigation of others, although (for reasons which are not clear) nothing ever came of this. Mr. Sneed persists, however, in claiming that the informant who introduced him to the undercover agent led him to believe that he was assisting the Government in an undercover operation of some unspecified purpose and scope. He thus claims that he mistakenly thought he was acting at the behest of the Government during the entire course of events. In light of the evidence at trial, I find this story to be incredible and inconsistent with full, timely acceptance of responsibility. After reviewing the factors outlined in U.S.S.G. § 3E1.1, comment (n.1) (Nov. 1988), I conclude that Mr. Sneed satisfies none of them. I therefore deny him the adjustment.

### Gundersen

52. Mr. Gundersen's claim to an adjustment for acceptance of responsibility presents a closer question, because his actions point in several different directions. When confronted by the FBI after the scheme was over, Mr. Gundersen made a statement and thereafter cooperated in a separate investigation by wearing a body microphone. He did so voluntarily, beguiled by the vague and illusory promise that his cooperation would be brought to the attention of a Government prosecutor. I note, however, that Mr. Gundersen's acknowledgement of his responsibility for the crime has usually been qualified: he freely admits his role in assembling the shell corporation, asserting that he mistakenly thought this was a legitimate way to make a living. He steadfastly disavows any real knowledge of, or involvement in, the remaining part of the scheme. This has been a consistent theme. By way of metaphor, he told the FBI that he made and sold the gun to others, but he did not shoot anyone; these other persons took the instrument, which could be used for good or bad purposes, and used it for bad purposes. As I have indicated above, I think Mr. Gundersen was aware of the overall scheme and acted as an aider and abettor of that scheme. The jury must have agreed, for it could not otherwise have returned the verdicts it did. Of the criteria outlined in U.S.S.G. § 3E1.1, comment (n. 1) (Nov. 1988), I find that Mr. Gundersen fully satisfies none. All of this convinces me that Mr. Gundersen has not fully admitted or accepted responsibility for his real part in the plot, notwithstanding his formalistic oral expressions of regret.

### Graulich

53. Among the three defendants, Mr. Graulich is unique: he and the Government negotiated a plea agreement, and he actually tendered a plea of guilty to the central charge of the indictment, securities fraud. I rejected the plea because the par-

ties proposed to make it conditional: Mr. Graulich wanted to withdraw the plea in the event I granted the other defendants' motion to dismiss because of excessive governmental involvement in the crime. It is therefore clear, in Mr. Graulich's case, that he went to trial solely to preserve this issue. He did not take the stand or otherwise deny or minimize his factual guilt. The predominant strategy of his counsel at trial was to stress the outrageous nature of the Government's conduct, not to minimize the nature of his own. I find that he has accepted responsibility for that conduct and therefore award him a two-point adjustment.

MISCELLANEOUS FACTUAL DISPUTES

54. I expressly make the following factual findings and reject any contrary factual suggestions in the presentence report or any party's sentencing statements:

(a) Mr. Gundersen did not recruit or attempt to recruit any market makers.

(b) The person named as "Michael Moss" in the evidence was an undercover FBI agent. He was introduced into the scheme by the primary undercover agent (Agent Coffey, posing as "John O'Kelly") and acted as a nominee seller in the scheme. Although he spoke with Mr. Graulich and was told by Mr. Graulich how to act in the event there were an investigation, he was not a broker in Mr. Graulich's firm, nor did Mr. Graulich control his activities.

(c) With respect to paragraph 14 of Mr. Graulich's report, I reject any implication that Mr. Graulich agreed to set up the market makers; in fact, Mr. Pandolfo and Mr. Fisher were introduced into the scheme by others. Mr. Graulich, however, did agree to a fee of $10,000 and was one of those who orchestrated the manipulation.

(d) I accept the assertion, in paragraph 22 of the Gundersen and Graulich reports, that, when the SEC suspended trading, both Mr. Gundersen and Mr. Graulich suggested that trading could be resumed as soon as the schemers had satisfied the SEC's concerns.

55. I determine that no finding is necessary concerning all other disputed factual issues The controverted matters were not taken into account in imposing sentence. *See* Fed.R.Crim.P. 32(c)(D)(ii); *United States v. Wach*, 907 F.2d 1038 (10th Cir.1990).

56. Neither the Government nor any defendant has challenged any other aspect of the presentence investigation report. Therefore, the remaining factual statements in the report are adopted without objection.

GUIDELINE CALCULATIONS
AND FINDINGS

57. Based upon the materials in the presentence investigation report, I find the appropriate guideline calculations to be as follows:

58. SNEED

| | | |
|---|---|---|
| (a) | Base Offense Level | 6 |
| (b) | More Than Minimal Planning | +2 |
| (c) | Organizer or Leader Adjustment | +4 |
| (d) | **Adjusted Offense Level** | 12 |
| (e) | **Total Offense Level** | 12 |
| (f) | Criminal History Category | I |
| (g) | Imprisonment Range | 10 months to 16 months |
| (h) | Supervised Release Range | two to three years |
| (i) | Fine Range | $3,000 to $1,000,000 |

59. GRAULICH

| | | |
|---|---|---|
| (a) | Base Offense Level | 6 |
| (b) | More Than Minimal Planning | +2 |
| (c) | Manager or Supervisor Adjustment | +3 |
| (d) | **Adjusted Offense Level** | 11 |
| (e) | Adjustment for Acceptance of Responsibility | −2 |
| (f) | **Total Offense Level** | 9 |
| (g) | Criminal History Category | I |

| | | |
|---|---|---|
| (h) | Imprisonment Range | 4 months to 10 months |
| (i) | Supervised Release Range | two to three years |
| (j) | Fine Range | $1,000 to $1,000,000 |

60. GUNDERSEN

| | | |
|---|---|---|
| (a) | Base Offense Level | 6 |
| (b) | More Than Minimal Planning | +2 |
| (c) | Manager or Supervisor Adjustment | +3 |
| (d) | **Adjusted Offense Level** | 11 |
| (e) | **Total Offense Level** | 11 |
| (f) | Criminal History Category | I |
| (g) | Imprisonment Range | 8 months to 14 months |
| (h) | Supervised Release Range | two to three years |
| (i) | Fine Range | $2,000 to $1,000,000 |

61. No restitution is owed.

## DEPARTURE QUESTIONS

ADEQUACY OF LOSS CALCULATIONS

██ 62. The guidelines recognize that "[d]ollar loss often does not fully capture the harmfulness and seriousness of the conduct." U.S.S.G. § 2F1.1, comment (n. 9) (Nov. 1988). The guidelines therefore expressly permit an upward departure in such a case. *Id.* Although application note 9 lists several such instances, they are plainly enumerated by way of example, and the note says that appropriate situations for a departure "may include" such instances. I therefore conclude that a departure may be warranted, even if the facts of this case do not fall into any of these specific categories.

██ 63. In applying the fraud guideline, I have concluded that the proper loss figure for a "sting" operation, structured as this one was, is zero. I have done so largely on the premise that there was never any possibility of a real loss to a real victim and that use of a fictional loss figure invented largely by Government agents would effectively permit them to set the loss figure. I nonetheless recognize that a figure of zero is almost as fictional, in terms of defendants' culpability, because it attributes the same level of loss to

this intricate, carefully-executed scheme as I would attribute to a bank teller who embezzled $500 from his or her cash drawer on a single occasion. While other guideline adjustments (more than minimal planning, for example) may account for part of the difference in the two situations, I still think some degree of departure is required to account for the seriousness of these defendants' conduct. *See Kahn*, 969 F.2d at 222 (sentencing court could have considered upward departure in case where intended loss was impossible to inflict).

64. Assuming that the facts here warrant a departure from the guidelines, the remaining issue concerns the degree of departure. Because the rationale for departure is rooted in the inadequacy of the calculated loss figure to reflect the seriousness of defendants' conduct, I believe the degree of departure must be explained in terms related to the concept of loss. I have already concluded that the loss figures preferred by the parties were either wholly unintended or wholly unrealistic. The amount of the bank loan, for example, was determined by the Government, not defendants; as a practical matter, defendants (especially Mr. Gundersen and Mr. Graulich) were undoubtedly indifferent concerning the amount or terms. Their main concern was the money they were to receive in the scheme. This was a negotiated amount. Defendants had at least as much input into the figure as the Government. Indeed, the Government's incentive was to negotiate hard for a lower amount; the defendants', for a higher amount. There is some justice in saying that each defendant should be stuck with the amount he negotiated for himself, even though the overall harm could never be accomplished. In fact, Mr. Gundersen and Mr. Graulich received the bulk of the fixed sum for which they bargained. Mr. Sneed did not and could not, given the impossibility of the scheme and the fact that he had hitched his wagon to it, but that was what he negotiated. I view Mr. Sneed's conduct as substantially more culpable than Mr. Gundersen's or Mr. Graulich's precisely because he bargained for a percentage arrangement that gave him a direct economic interest in seeing that the scheme

succeeded. His greater anticipated share of the intended profits reflects that greater culpability.

65. For the reasons stated above, I will depart upward to an offense level which reflects a loss figure based on the anticipated gain which each defendant negotiated for himself. In doing so, I will use the 1988 loss table, since the 1989 amendments to the table disadvantage a defendant if the figure is greater than $40,000. Mr. Sneed's negotiated share is $147,000, meriting a six-level upward adjustment to level 18. Mr. Graulich's negotiated share is $10,000, meriting a two-level upward adjustment to level 12. Mr. Gundersen's negotiated share is $40,000, meriting a four-level upward adjustment to level 15. The corresponding imprisonment ranges are:

| | | |
|---|---|---|
| (a) | Sneed | 27 months to 33 months |
| (b) | Graulich | 8 months to 14 months |
| (c) | Gundersen | 18 months to 24 months |

66. It may seem anomalous to depart upward, based on a defendant's negotiated or anticipated gain, and yet return to the "loss" table to determine the degree of departure. The anomaly is more apparent than real, for the guidelines permit the "loss" table to function as a "gain" table as well. The guideline commentary suggests that an "offender's gross gain from committing the fraud is an alternative estimate" of loss, although the sentencing commission adds that use of "gross gain" will *ordinarily* understate the true loss. U.S.S.G. § 2F1.1, comment (n.8) (Nov.1988). Also, the guideline for commercial bribery, which measures the total offense level partly by gain to either the person offering the bribe or the person receiving the bribe, refers to the "loss" table in the fraud guideline, thus making the "loss" table a "gain" table as well.

SNEED'S REQUEST FOR DOWNWARD DEPARTURE

67. The basis of Mr. Sneed's request for a departure is not entirely clear. It is partly based on coercion by the undercover agent in chastising Mr. Sneed for not working hard enough. It is also partly based on the fact that this was an undercover "sting" operation. With respect to the first ground, I understand that the guidelines recognize coercion or duress as a basis for departure. U.S.S.G. § 5K2.12, p.s. (Nov.1988). The problem is that the agent's scoldings hardly amount to coercion. With respect to the second ground, I realize that some decisions, cited by Mr. Sneed, have permitted a departure in the context of an undercover operation, vaguely suggesting that the sentencing commission did not adequately consider "the sting problem." *United States v. Giles*, 768 F.Supp. 101, 104 (S.D.N.Y.1991). Those decisions are factually unlike this case, and Mr. Sneed has identified nothing so outrageous or unusual about this undercover operation as to support a departure.

GRAULICH'S REQUEST FOR DOWNWARD DEPARTURE

68. Mr. Graulich seeks a downward departure based on the fact that the Government, in the rejected plea agreement, had agreed in principle to move for a substantial-assistance departure under U.S.S.G. § 5K1.1 (Nov.1988). He urges that the Government has reneged on its agreement, that it is acting in bad faith, that I should so find, and that I should depart to a level at which Mr. Graulich would be eligible for probation (as provided in the rejected plea agreement).

69. While Mr. Graulich cites authority from other circuits suggesting that a court can review the Government's refusal to file a section 5K1.1 motion for bad faith, I have some doubt that this authority is good law in this circuit. The Tenth Circuit has stated time and again that the court cannot use section 5K1.1 as a basis for departure without a motion from the Government. *E.g., United States v. Muñoz*, 946 F.2d 729 (10th Cir.1991). In light of these cases, I doubt that this court could ignore the absence of such a motion, even if it determined the Government was acting in bad faith.

70. In any event, the matter is academic here, for the Government is not proceeding in bad faith. Any possible departure was premised on Mr. Graulich's testimony in a related case which was tried before Judge Matsch while this one was pending. Mr. Graulich would not testify without a grant of immunity, and the Government would not

seek an immunity order, perhaps because the Government thought it would create problems in this case. This was a tactical decision for the Government to make and is not any proof of bad faith.

71. I find no other reason to depart from the sentences called for by application of the guidelines. The reasons for the sentences, *see* 18 U.S.C.A. § 3553(c) (West 1985), were stated in open court.

## IMPOSITION OF SENTENCE

72. The sentences imposed are as follows:

73. SNEED

(a) Defendant is committed to the custody of the United States Bureau of Prisons, to be imprisoned for a period of 33 months. The court recommends to the Bureau of Prisons that defendant receive credit for one day spent in official detention prior to sentencing. The court further recommends that the Bureau of Prisons designate FPC Allenwood for service of sentence, assuming that this institution is the appropriate level for this offender.

(b) Upon release from his term of imprisonment, defendant will serve a term of three years on supervised release. Within 72 hours of his release from the custody of the Bureau of Prisons, defendant will report in person to the probation office in the district to which he is released. Defendant will observe all "standard" conditions of supervised release set forth at U.S.S.G. § 5B1.4(a), p.s. (Nov.1988). He will also observe the following special conditions:

i) He will not possess any firearm or destructive device.

ii) He will not illegally possess or use controlled substances.

iii) He will not commit a federal, state, or local crime.

iv) He will pay the fine imposed in paragraph 73(c).

v) He will perform 200 hours of community service, as directed by the probation officer.

vi) He will provide the probation officer with all requested financial information.

vii) He will not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless he is in compliance with all periodic payment obligations imposed pursuant to the court's judgment and sentence.

(c) Defendant will pay a fine of $15,000, either in a lump sum or in installments of at least $420 per month.

(d) The defendant shall pay a special assessment of $200. 18 U.S.C.A. § 3013 (West 1985). This amount shall be payable immediately.

74. GRAULICH

(a) Defendant is committed to the custody of the United States Bureau of Prisons, to be imprisoned for a period of 14 months. The court recommends that the Bureau of Prisons designate MCC Miami for service of sentence, assuming that this institution is the appropriate level for this offender.

(b) Upon release from his term of imprisonment, defendant will serve a term of three years on supervised release. Within 72 hours of his release from the custody of the Bureau of Prisons, defendant will report in person to the probation office in the district to which he is released. Defendant will observe all "standard" conditions of supervised release set forth at U.S.S.G. § 5B1.4(a), p.s. (Nov.1988). He will also observe the following special conditions:

i) He will not possess any firearm or destructive device.

ii) He will not illegally possess or use controlled substances.

iii) He will not commit a federal, state, or local crime.

iv) He will pay the fine imposed in paragraph 74(c).

v) He will perform 200 hours of community service, as directed by the probation officer.

vi) He will provide the probation officer with all requested financial information.

vii) He will not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless he is in compliance with all periodic payment obligations imposed pursuant to the court's judgment and sentence.

(c) Defendant will pay a fine of $10,000, either in a lump sum or in installments of at least $300 per month.

(d) The defendant shall pay a special assessment of $200. 18 U.S.C.A. § 3013

(West 1985). This amount shall be payable immediately.

75. GUNDERSEN

(a) Defendant is committed to the custody of the United States Bureau of Prisons, to be imprisoned for a period of 24 months. The court recommends to the Bureau of Prisons that defendant receive credit for one day spent in official detention prior to sentencing. The court further recommends that the Bureau of Prisons designate the facility nearest to Salt Lake City, Utah which is the appropriate level for this offender.

(b) Upon release from his term of imprisonment, defendant will serve a term of three years on supervised release. Within 72 hours of his release from the custody of the Bureau of Prisons, defendant will report in person to the probation office in the district to which he is released. Defendant will observe all "standard" conditions of supervised release set forth at U.S.S.G. § 5B1.4(a), p.s. (Nov.1988). He will also observe the following special conditions:

i) He will not possess any firearm or destructive device.

ii) He will not illegally possess or use controlled substances.

iii) He will not commit a federal, state, or local crime.

iv) He will pay the fine imposed in paragraph 75(c).

v) He will perform 200 hours of community service, as directed by the probation officer.

vi) He will provide the probation officer with all requested financial information.

vii) He will not incur new credit charges or open additional lines of credit without the approval of the probation officer, unless he is in compliance with all periodic payment obligations imposed pursuant to the court's judgment and sentence.

(c) Defendant will pay a fine of $15,000, either in a lump sum or in installments of at least $420 per month.

(d) The defendant shall pay a special assessment of $200. 18 U.S.C.A. § 3013 (West 1985). This amount shall be payable immediately.

76. Defendants have been advised of their right to appeal the jury's verdicts of guilty and the sentences imposed. If any defendant wishes to appeal, his trial counsel shall assist him in perfecting the appeal. If he cannot pay the cost of an appeal, he may apply to the court for leave to appeal *in forma pauperis*. If a defendant so requests, the clerk of the court shall prepare and file forthwith a notice of appeal on behalf of defendant.

77. Defendants were ordered to surrender themselves voluntarily to the United States Marshal for the District of Colorado at 4:00 o'clock p.m. on February 11, 1993.

78. The clerk shall prepare the judgments required by rule 32(b) of the Federal Rules of Criminal Procedure, in accordance with this Memorandum of Sentencing Hearing and Report of Statement of Reasons. The clerk shall file this Memorandum of Sentencing Hearing and Report of Statement of Reasons. The Probation Department shall attach a copy to the presentence investigation report. The Probation Department shall also forward copies to the United States Sentencing Commission and the United States Bureau of Prisons.