UNITED STATES of America, Plaintiff–Appellee,

v.

Steven SNEED, Defendant–Appellant.

No. 93–1058.

United States Court of Appeals, Tenth Circuit.

Sept. 13, 1994.

Marcella T. Clark (Philip E. Lowery with her on the briefs), Lowery and Lowery, P.C., Denver, CO, for defendant-appellant.

Kenneth R. Fimberg (Henry L. Solano, U.S. Atty., Gerald J. Rafferty, Asst. U.S. Atty., with him on the brief), Asst. U.S. Atty., Denver, CO, for plaintiff-appellee.

Before BALDOCK, BARRETT and BRORBY, Circuit Judges.

BARRETT, Senior Circuit Judge.

Steven Sneed (Sneed) appeals from the district court's judgment and sentence imposed following a jury trial. Sneed was found guilty of one count of aiding and abetting securities fraud (18 U.S.C. § 2 and 15 U.S.C. §§ 78j(b) and 78ff), two counts of aiding and abetting mail fraud (18 U.S.C. §§ 2 and 1341), and one count of aiding and abetting wire fraud (18 U.S.C. §§ 2 and 1343). He was sentenced to 33 months imprisonment, 3 years supervised release, and fined $15,000 with a special assessment of $200.00.

*FACTS*

In late 1988 and early 1989, the Federal Bureau of Investigation (FBI), in conjunction with the Securities and Exchange Commission (SEC), commenced a "sting" operation to investigate fraud in the Rocky Mountain area penny stock market industry. The FBI established a Colorado corporation known as Monarch Investment Services (Monarch) and opened an office in Denver, Colorado. FBI Special Agent John Coffey (Coffey) posed as the company's president, "John O'Kelly"

(O'Kelly), and let it be known in Denver's penny stock community that he was interested in finding an individual to assist him in doing a "box job" by obtaining a "boxed" public company and manipulating the price of its worthless stock.[1]

From mid-January to early March, 1989, Anthony Cavanaugh (Cavanaugh), an FBI informant and convicted felon, introduced O'Kelly to various people in the securities industry. Cavanaugh introduced O'Kelly by telephone to Sneed, a licensed securities professional and promoter. Sneed flew to Denver from Virginia for a January 16, 1989, meeting. During this meeting, which was taped by the FBI, Cavanaugh, O'Kelly, and Sneed discussed the plans to purchase a shell company,[2] including all of the corporate stock, create false nominee owners of the stock, and trade the stock back and forth between the nominees and O'Kelly in order to manipulate the market. (Appellee's Addendum, Exh. 1–2A). The inflated stock was then to be used as collateral to partially secure a large offshore bank loan.[3] Sneed agreed to locate a shell company. He was to receive at least $2,500 when a letter of intent for the purchase of the shell was signed and ten percent of the net loan proceeds (approximately $147,000) when the bank loan was obtained.[4]

From January to April, 1989, Sneed introduced O'Kelly to a number of people who had "boxed" companies or other corporate vehicles for sale. For various reasons, these companies were not suitable. In April, 1989, by telephone, Sneed introduced O'Kelly to

---

1. A "box job," is a device whereby a small group of individuals controls virtually all of the stock of a corporation and artificially manipulates purchases and sales of the stock in order to manipulate the price of, or market for, the stock. Control of the corporation and its stock is concealed by the use of "nominee" or "straw" officers, directors and shareholders, who hold their stock in their own (or fictitious) names, but are controlled by the individuals manipulating the stock. Originally, the term referred to the controlling persons actually having the stock certificates "in a box."

2. A "shell" company is an inactive or defunct corporation with little or no assets which carries on no business activity.

3. In the typical instance, the control group of a "boxed" public company manipulates the price of the stock to some target price and then "retails" the stock, through cooperating brokers, to real public investors. Once the conspirators have their proceeds from selling the worthless stock to the public, the stock's alleged "value" crashes to zero.

In the Monarch sting operation, because the FBI wanted to avoid exposing public investors to the fraudulent scheme, it used the offshore bank loan as the financial incentive.

4. Sneed received $7,115.66 over the course of the scheme.

Brent Gundersen (Gundersen) from Salt Lake City, Utah, whom Sneed learned about through Herman Graulich (Graulich),[5] a marketmaker with Morgan Gladstone & Co., Inc., Boca Raton, Florida.[6] Gundersen agreed to provide O'Kelly with a shell company for $40,000, with a $20,000 down payment and a final $20,000 payment when the company's stock was listed in Standard & Poors and ready to trade. Gundersen also offered to supply O'Kelly with a few more shareholders if needed.

On April 26, 1989, O'Kelly and Sneed flew to Salt Lake City to meet with Gundersen. Gundersen told O'Kelly and Sneed that he could deliver one hundred percent of the stock of a defunct company, Androids, which he could get in the Pink Sheets.[7] Gundersen also related that he could provide documents to provide credibility to the company, such as certified financial statements, a listing in Standard & Poors, and an attorney's opinion, or tradeability letter.

Gundersen worked with Eldon Weber (Weber)[8] and others to "revive" the company and prepare the necessary corporate history and documentation in the names of nominee shareholders, officers, and directors. Androids' back taxes and reinstatement fees were paid by Gundersen and he bought "shareholders's" signatures. Gundersen created and backdated various false documents such as stock certificates and minutes of directors's and shareholders's meetings. Through the false documentation, Gundersen was able to obtain an attorney's opinion letter which indicated that the stock could be freely and publicly traded because the shareholders had owned the restricted insider stock for the required holding period. An-

droids' name was changed to Monarch Acquisitions, Inc.

During May and June, 1989, Sneed and Gundersen recruited Sam Pandolfo[9] (Pandolfo) in Denver and Graulich in Florida to assist in the scheme. For a fee, Pandolfo was to get the company listed in the Pink Sheets and Graulich was to arrange the marketmakers and orchestrate the prearranged trades in the company's stock. During this time period, Sneed prepared Monarch's business plan.

During the summer, Sneed and Graulich recruited marketmakers and cooperating brokers to trade Monarch's stock. The marketmakers were to go into the Pink Sheets and make a market in the stock, and the retail brokers were to open nominee accounts to execute trades where both the buyers and sellers were controlled by the Monarch participants. Pandolfo's firm, General Bond & Share Co., was to be the first marketmaker to go in the "pinks." Sneed arranged for Harold Fisher (Fisher) of Roth Securities, Sarasota, Florida, to act as a marketmaker, and recruited Peter Schwartz (Schwartz) of J.W. Gant & Associates, Inc., Greenwood, Colorado, to open retail "buying" accounts.[10] Graulich opened a nominee account for "Michael Moss" at Morgan Gladstone & Co., Inc.[11] and also arranged for Kashner Davidson Securities Corp., Sarasota, Florida, to act as a third marketmaker.

By the latter part of July, Sneed had prepared a detailed written schedule for the first week of controlled, prearranged trades in Monarch's stock. Sneed planned to take Monarch from three cents to twenty-five

---

**5.** Gundersen and Graulich were jointly tried and convicted with Sneed for their participation in the Monarch scheme. Their related appeals are addressed separately.

**6.** A marketmaker is a broker-dealer that holds itself out to the investing public as willing to buy and sell the particular penny stock. This is also known as "making a market" in the stock.

**7.** The Pink Sheets are a daily publication of the National Quotation Bureau (NQB), a private company. Printed on pink paper, the pink sheets list penny stocks, their marketmakers, and their price.

**8.** Weber pled guilty to this securities fraud scheme, cooperated with the government, and testified at trial about Gundersen's creation of bogus shell companies.

**9.** Pandolfo, another joint defendant, was acquitted at trial.

**10.** Fisher and Schwartz pled guilty to securities fraud for their part in the Monarch scheme.

**11.** Michael Moss was an assumed name used by one or more FBI special agents during the course of this investigation.

cents a share in only one week. In August, Graulich reviewed the schedule and recommended that several changes be made. Graulich also suggested the use of cashier's checks in the nominees' names to make the money tracing more difficult.

In September, 1989, final preparations were made. On September 14, Pandolfo submitted the false 15c 2–11 form [12] to the NQB and his firm, General Bond & Share, entered the Pink Sheets as Monarch's lead marketmaker. Prior to the October 10, 1989, trading date, some modifications were made to the trading schedule.

On October 10, 1989, Sneed joined O'Kelly at Monarch's office in Denver and directed the day's activity. Graulich and Pandolfo had General Bond & Share make the first trade. On October 11, Sneed placed prearranged trades with Schwartz at J.W. Gant & Associates, Inc. That same day, Scott Fitzpatrick (Fitzpatrick) [13] opened a nominee account for "John Pergram" at Tri–Bradley Investments, Inc., Englewood, Colorado, and agreed with O'Kelly to trade the stock. The trading continued to October 12, when Fitzpatrick purchased 20,000 shares in the "John Pergram" account, for twelve cents a share.

In five trades over the three trading days, the scheme succeeded in moving the price of Monarch's stock, of which there were 7,500,000 shares issued and outstanding, from five cents to twelve cents a share for a total "value" of $900,000. On October 13, 1989, the SEC, by prior arrangement with the FBI, suspended trading to prevent any possible public trading. In telephone conversations after the suspension, Gundersen and Graulich encouraged O'Kelly not to worry, and said that they should just lay low and could resume trading in a few days. Gundersen told O'Kelly, "We're all covered [and] ... I can provide ... any documents ... [t]hat they have questions about." (Appellee's Addendum, Vol. 2, Tab 1–67A at 4).

## ISSUES

Sneed frames the issues on appeal as: (1) Did the trial court err in denying Sneed's Motion to Dismiss the Indictment based on the outrageous conduct of the government; (2) Did the trial court err in allowing the peremptory challenge of a juror, Ms. Low; (3) Did the trial court err in denying Sneed's Motion for Discovery; (4) Did the trial court err in allowing certain prejudicial opinion testimony of FBI Special Agent Coffey; and (5) Was the sentence imposed by the court improper as a matter of law?

### I.

■ Sneed contends that the trial court erred in denying his Motion to Dismiss the Indictment based on outrageous governmental conduct because the governmental agents created, engineered, and directed the undercover sting operation from start to finish. Sneed maintains that the governmental conduct in this instance is so grossly shocking and outrageous that it violates the Due Process Clause of the Fifth Amendment of the United States Constitution and should bar his conviction.

■ The issue of whether a law enforcement agent's conduct is outrageous is reviewed *de novo*. *United States v. Diggs*, 8 F.3d 1520, 1523 (10th Cir.1993).

■ When the government's conduct during a sting operation is sufficiently outrageous, the courts will not allow the government to prosecute the crimes which are the result of that conduct. *United States v. Mosley*, 965 F.2d 906, 908 (10th Cir.1992). Under those circumstances, a defendant may assert the outrageous governmental conduct defense, which is based on the Due Process Clause of the Fifth Amendment to the United States Constitution. *Id.* at 908–09. The outrageous governmental conduct defense is distinct from the entrapment defense because the entrapment defense considers the

---

**12.** A "15c 2–11" is a form that must be filed with the NQB by each broker-dealer who wishes to be identified as a marketmaker in a particular stock. It contains general information about the company and its stock, as well as the basis for the price quoted for the stock.

**13.** Fitzpatrick pled guilty to a felony false books and records charge for his involvement in the Monarch scheme.

predisposition of the defendant to commit the crime. *Id.* at 909; *see Jacobson v. United States,* —— U.S. ——, ——, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992). In contrast, the outrageous governmental conduct defense looks only at the government's conduct. *Mosley,* 965 F.2d at 909.

The outrageous governmental conduct defense was first described in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642, 36 L.Ed.2d 366 (1973). In a later plurality decision, *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the concurring opinion left open the possibility that an outrageous governmental conduct defense based on the Due Process Clause might be successfully invoked despite the unavailability of the entrapment defense due to predisposition. *Id.* at 494–95, 96 S.Ct. at 1652.

■ The outrageous governmental conduct defense "is an extraordinary defense reserved for only the most egregious circumstances. It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating. Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense." *Mosley,* 965 F.2d at 910.

■ In *Mosley,* we observed that "two factors ... form the underpinnings for most cases where the outrageous conduct defense has been upheld: government creation of the crime and substantial coercion." *Id.* at 911.

A. Government Creation of the Crime

■ Government creation of the crime occurs when there has been excessive governmental involvement in generating a new crime solely to prosecute it or in inducing a defendant to become involved in the crime for the first time, rather than merely interposing itself in an ongoing criminal enterprise. Excessive governmental involvement occurs when the government engineers and directs the criminal enterprise from start to finish and the defendant contributes nothing more than his presence and enthusiasm. *United States v. Harris,* 997 F.2d 812, 816 (10th Cir.1993). *See, e.g., United States v. Lard,* 734 F.2d 1290, 1296–97 (8th Cir.1984)

(stating, in dicta, that an alternative ground for reversing the conviction was that the governmental conduct approached being sufficiently outrageous to sustain a due process defense because the government agent's over-involvement in conceiving and contriving the crimes was aimed at creating new crimes for the sake of bringing criminal charges against the defendant); *United States v. Twigg,* 588 F.2d 373, 381 (3d Cir. 1978) (determining that fundamental fairness prevented a defendant from being convicted because of outrageous governmental conduct where the government agent supplied the necessary ingredient, purchased almost all of the other supplies, established the lab, and was the only person with the knowledge necessary to manufacture methamphetamine); *Greene v. United States,* 454 F.2d 783, 786–87 (9th Cir.1971) (determining that the government was barred from prosecuting the defendants because the government permitted itself to become enmeshed in criminal activity from beginning to end when the government helped to reestablish and sustain bootlegging operations in which the government was the only customer).

■ It is not excessive governmental involvement for the government "to infiltrate an ongoing criminal enterprise" or "to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Mosley,* 965 F.2d at 911. Moreover, the government can suggest the illegal activity, can provide supplies and expertise for the activity, and can act as both supplier and buyer in sales of illegal goods in order to induce the defendant to repeat, continue, expand, or extend the criminal activity. *Id.* at 911–12.

Here, the FBI was aware of the fraud and abuses which were occurring in the Rocky Mountain penny stock market. The investigation was designed to uncover ongoing criminal behavior, not to manufacture a new crime. To this end, the FBI established Monarch Investment Services as a front organization with O'Kelly engaging in appropriate conduct to maintain this front and his undercover role. Through O'Kelly, the FBI implemented the scenario of a crooked businessman looking for a "boxed" public compa-

ny in order to manipulate its stock through arranged nominee trades.

Though the FBI initiated the contact and admittedly outlined the basic plan to Sneed, he readily adapted and refined the suggested plan, adding the crucial details in order to make it work smoothly. Sneed had a direct, active, and primary role in organizing and planning the Monarch fraud. He acted as a finder in searching for a shell corporation, he recruited marketmakers and other key players, he devised Monarch's business plan and trading schedule, and he orchestrated the trades. The government simply provided Sneed an opportunity to commit the securities fraud, which he fully embraced.

### B. Coercion

We next consider whether the government's means of influencing the defendant into participating in the scheme were substantially coercive to the point of being outrageous. The coercion, "must be particularly egregious before it will sustain an outrageous conduct defense." *Mosley*, 965 F.2d at 912.

Sneed contends that he was coerced by O'Kelly into becoming involved because he was told that he would receive $147,000 when the loan was received and at least $2,500 when he obtained a signed letter of intent for the acquisition of the shell corporation. Sneed argues that O'Kelly also coerced him when, in June, 1989, O'Kelly became enraged with him and told him that if he wanted $147,000, he had better plan on doing some work to get it done.

The district court found that the defendants's hoped-for gain "was a negotiated amount," and the defendants "had at least as much input into the figure as the Government." *United States v. Sneed*, 814 F.Supp. 964, 979 (D.Colo.1993). We agree with the district court that the amount of the compensation was negotiated. The government did not unilaterally set a figure excessively high with the purpose of coercing Sneed into assisting in the scheme.

Moreover, O'Kelly's comment to Sneed was completely consistent with his undercover role as a crooked businessman dealing with a conspirator who was not doing what he had promised to do in return for his fee. Sting operations, though necessarily deceptive, are an effective law enforcement tool to uncover securities fraud. As in the investigation of illicit narcotics trafficking, gathering after-the-fact evidence of illegal manipulation of penny stocks would be an all but impossible task. In fact, without an undercover agent or cooperating insider, stock manipulation would be even more difficult to detect than narcotics trafficking because of the large numbers of legal transactions occurring simultaneously. We hold that neither the compensation amount nor O'Kelly's conduct was substantially coercive.

Accordingly, we hold that the governmental conduct was not sufficiently outrageous, if at all, to reach the level of fundamental unfairness violative of the Due Process Clause of the Fifth Amendment to the United States Constitution.

### II.

Sneed contends that the trial court erred in allowing the peremptory challenge of a juror, Ms. Low, who is Chinese–American. Sneed argues that the defense made a timely objection to this peremptory challenge and the defense made the required prima facie showing of discrimination.

During jury selection, Ms. Low was called to the jury box for voir dire. (Appellant's App., Vol. 22 at 124). At a sidebar conference, Ms. Low stated that her husband had a felony charge before they were married but that she would rather not divulge it. *Id.* at 125. The prosecution subsequently exercised a peremptory challenge to excuse her. *Id.* at 128.

After Ms. Low left the courtroom and another potential juror had been questioned, co-defendant Gundersen's counsel objected to the government's peremptory challenge of Ms. Low under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (Equal protection clause forbids the prosecutor from challenging potential jurors solely on account of their race). The basis for his objection was that Ms. Low appeared to be

the only Asian–American on the panel. (Appellant's App., Vol. 22 at 131–32).

After some discussion outside the presence of the jury, the district court asked the prosecutor to explain his reasons for the challenge. The prosecutor stated that Ms. Low had a close relative who had a pending felony charge, and that Ms. Low was uncomfortable about discussing it. *Id.* at 134–35. When the district court corrected the prosecutor and said that her husband's felony charge was in the past, the prosecutor stated that the main reasons for the peremptory challenge were: that Ms. Low's husband was the person charged, the charge itself, and the fact that she asked to approach the bench and had a problem with discussing it openly. *Id.* at 135. Gundersen's attorney asked that Ms. Low be brought back for additional questioning. *Id.* at 136. The district court agreed to have the clerk attempt to get her back, but Ms. Low could not be reached quickly enough to prevent a delay in the jury selection process and the trial.

After the lunch recess, the district court held a conference to address the issue of Ms. Low's peremptory challenge. *Id.*, Vol. 21 at 4. The prosecutor again explained that he had misunderstood Ms. Low's response to the felony charge question and thought at first that she said she had a pending felony charge against her. However, the prosecutor said there were independent, specific, and articulable reasons that were racially neutral. *Id.* at 5. The prosecutor continued to support the peremptory challenge because of her husband's prior felony matter. Also, his intuition told him that she would be more sympathetic towards the defense because she worked in the counseling field and lived in Boulder, Colorado, commonly known as a liberal community. *Id.* at 6.

The district court ruled that the defendants's challenge was untimely because Ms. Low had already been excused from the courtroom and because the defense could have made the objection earlier. *Id.* at 9. The district court also ruled that the defendants had not made a prima facie showing, in that the defendants had not met their burden of proving that the United States had intentionally challenged Ms. Low on the basis of

race or national origin. *Id.* at 11–12. Furthermore, the district court found that the prosecutor's explanation was adequate and in good faith and that the government's exercise of the peremptory challenge was reasonable under the circumstances. *Id.*

For purposes of our analysis, we may assume, without deciding, that the defense counsel's objection to the peremptory challenge was timely.

Then, under *Batson,* 476 U.S. at 96–98, 106 S.Ct. at 1722–24, once a defendant has established a prima facie case by showing that the prosecutor has exercised peremptory challenges on the basis of race, the burden then then shifts to the prosecution to provide a race neutral explanation for its strikes. This accomplished, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id.* at 98, 106 S.Ct. at 1724.

The defendant need not establish a prima facie case, the threshold under *Batson,* in every instance, if the other two prongs have nevertheless been met. "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." *Hernandez v. New York,* 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).

Moreover, in examining the prosecutor's explanation, "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* Once a race neutral reason is offered, "the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal...." *Id.* at 364, 111 S.Ct. at 1868–69. In making its determination, the district court can consider whether the prosecutor's explanation is a mere pretext for race-based peremptory challenges. *Id.* at 364, 111 S.Ct. at 1868. The trial court's findings on the issue of discriminatory intent largely turn on an evaluation of the prosecutor's credibility. *Id.* at 364, 111 S.Ct. at 1869.

We review *de novo* whether the prosecutor's explanation is facially race neutral. We then review the district court's ruling that the prosecutor did not intend to discriminate under the clearly erroneous standard. *United States v. Johnson*, 4 F.3d 904, 913 (10th Cir.1993), *cert. denied*, — U.S. ——, 114 S.Ct. 1082, 127 L.Ed.2d 398 (1994).

Here, the issue of whether the defendants established a prima facie case of discrimination is moot because the prosecutor gave his explanation of the peremptory challenge of Ms. Low and the district court ruled on the ultimate question of intentional discrimination.

The prosecutor stated that he, mistakenly, thought that Ms. Low had a pending felony charge. When corrected, he stated that he had other independent, specific, and articulable reasons. Irrespective of who the felony charge involved, the prosecutor was also concerned about Ms. Low's discomfort in discussing the charge as evidenced by her request for a sidebar conference, her profession in the counseling field, and the fact that she lived in Boulder. Because a discriminatory intent is not inherent in the prosecutor's explanation, we deem it race neutral as a matter of law.

The district court found that the prosecutor's explanation was adequate and in good faith and that the government's exercise of the peremptory challenge was reasonable under the circumstances. The district court determined that the prosecutor was credible. Based on the record before us, we hold that the district court's determination is not clearly erroneous. Accordingly, we hold that there was no *Batson* error in allowing the prosecution's peremptory challenge of Ms. Low.

### III.

Sneed contends that the trial court erred in denying his Motion for Discovery. Sneed claims that he was induced and encouraged by Cavanaugh to participate in this sting operation as a government agent and therefore he had no intent to defraud. In support of his defense, Sneed claims that the government has exculpatory taped conversations from the summer and fall, 1988, between Sneed, Cavanaugh, informant Gene Humphrey, "Michael Moss," and/or other government agents. Though the government denies the existence of any such exculpatory tapes, Sneed claims that because all of his conversations with O'Kelly were taped, the other tapes must exist also.

During an *in camera* hearing to discuss Sneed's discovery request, the government disclosed that one taped conversation existed in which Cavanaugh introduced "Michael Moss" to Barry Fortner, an individual in the Denver penny stock market who was being investigated in a separate undercover operation. The government stated that this taped conversation would arguably fall within Sneed's discovery request which provided, in pertinent part:

2. All documents and tangible objects defined in Fed.R.Crim.P. 16(a)(1)(C), which have not already been provided to Defendants including but not limited to any and all reports compiled by law enforcement authorities in the investigation and preparation of this case, including rough notes and typed reports, concerning the following:

\*    \*    \*    \*    \*    \*

b. Anthony Cavanaugh and Barry Fortner meetings and conversations concerning corporate purchases for other hotel groups.

\*    \*    \*    \*    \*    \*

(Appellant's App., Doc. 17 at 2).

The district court ruled that disclosure of this tape would jeopardize the separate ongoing investigation and that the tape was not relevant to Sneed or the Monarch transactions. (Appellant's App., Vol. 53 at 21–22). In making its ruling, the district court relied on the representations of the Assistant United States Attorney which were supported by the affidavits of Agents Coffey and Witkowsky. The district court did not review the tape, did not require the agents to give sworn testimony on this issue, and did not require the government to turn the tape over or include a transcript of it in the record.

The district court sealed the evidence and the transcript of the *in camera* proceeding.

■ We review *de novo* Sneed's claim that the government failed to disclose evidence favorable to the accused in accordance with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *United States v. DeLuna*, 10 F.3d 1529, 1534 (10th Cir.1993).

■ To establish a *Brady* violation, the defense must prove that: (1) the government suppressed the evidence; (2) the evidence would have been favorable to the defendant; and (3) the suppressed evidence was material. *DeLuna*, 10 F.3d at 1534.

With regard to the alleged tapes of conversations from the summer and fall of 1988, Sneed has failed to establish the first *Brady* requirement. The attorneys for the United States, as officers of the court, have denied that any relevant tapes exist. A statement by Agent Coffey that it is a general policy of the FBI to tape conversations depending on the circumstances is insufficient to prove that other conversations were recorded.

With regard to the taped conversation which the government disclosed at the *in camera* hearing, Sneed has shown that the evidence was suppressed. However, Sneed has failed to establish that the evidence would have been favorable to him or that the evidence was material, the second and third *Brady* requirements. The only evidence in the record, the affidavits of the government agents, shows that Barry Fortner was not involved with Sneed in the Monarch scheme. Thus, the taped conversation with this individual was neither exculpatory nor was it material to the Monarch scheme.

Accordingly, we hold that the facts of this case do not constitute a *Brady* violation.

## IV.

■ Sneed asserts that the district court erred in allowing certain opinion testimony of Agent Coffey. Sneed claims that the statements he made to Agent Coffey (O'Kelly), were clear and straightforward statements which showed that Sneed was acting as a government agent and therefore could not

have had a specific intent to defraud. Sneed contends that because the jury heard Agent Coffey's interpretation of Sneed's statements, rather than looking at the clear statements themselves, the jury was not allowed to form its own conclusions regarding specific intent. Sneed argues that the admission of this testimony violated Fed.R.Evid. 701.

"[T]he admission of lay opinion testimony is within the sound discretion of the trial court and will not be overturned on appeal absent a clear abuse of discretion." *United States v. Hoffner*, 777 F.2d 1423, 1425 (10th Cir.1985).

Fed.R.Evid. 701, Opinion Testimony by Lay Witnesses, provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

■ A witness may base his testimony upon his perceptions of conversations and, thus, may clarify conversations that are abbreviated, composed of unfinished sentences and punctuated with ambiguous references to events that were clear only to the conversation participants. *United States v. Awan*, 966 F.2d 1415, 1430 (11th Cir.1992). The accuracy of those perceptions is a question for the jury. *Id.*

Sneed cites *United States v. Dicker*, 853 F.2d 1103, 1110 (3rd Cir.1988) in which the court held that when the undercover agent "simply ascribed his own, illicit meaning to straightforward, potentially legitimate statements," such testimony "was surely prejudicial, and was not helpful to a clear understanding of the testimony."

We have a different situation here. Sneed directs us to specific portions of the record in which counsel for each of the defendants were cross-examining Coffey. We have excerpted portions of this cross-examination to illustrate the context in which Coffey's opinion and interpretation of the events occurred. For example:

Q (by Ms. Clark for Defendant Sneed): Well, but Mr. Sneed also discussed general compliance requirements, didn't he?

Coffey: He talked about things that we would have to do in the way of filings for the company.

Q: Right. And, those were things that you had to do in order to keep the whole deal legal, correct?

Coffey: Filing the paperwork with the Securities & Exchange Commission or a marketmaker, whoever it is, was kind of like closing the barn door after the horses were out in this case. We were talking about market manipulation, moving the price, controlling the stock. That was simply paperwork that had to be done.

(Appellant's App., Vol. 32 at 58).

Q (by Mr. Lane for Defendant Gundersen): You said he already offered to sell you a box, 100 percent control of the corporation; is that correct?

Coffey: Correct.

Q: And, you took that to mean he knew what he was doing was illegal, there's something wrong with that, it that correct?

Coffey: I understood a 100 percent box company from every broker and every person I ever met in the industry to be clearly illegal.

*Id.,* Vol. 33 at 669.

Q (by Mr. Lane for Defendant Gundersen): Something Brent said indicated that this is a bogus promissory note?

Coffey: Well, he said, sir, with it later, you know, you're really flexible to do—

The Court: Where are you reading from?

Mr. Lane: The middle of page 14, Your Honor.

Coffey: The middle of page 14. Gundersen entry beginning, so, we have our new board of directors, give a promissory note. We give them the investment stock and then we could deal with it later. You know, you can—you're really flexible to do.

Q: And, that means this is a bogus promissory note?

Coffey: That's what I understood he was suggesting to me that the promissory notes would be put in after the new board was—I would have flexibility as to what to do with those notes.

\*   \*   \*   \*   \*   \*

Q: Did Brent Gundersen suggest that you were dishonest person or that—let me just make sure I understand this. This sentence right here, where he says give a promissory note and then you're flexible, that doesn't mean you're flexible because you have a lot of cash in your pocket that you didn't have before then, it would all be put in the promissory note. You didn't take it to mean that, did you?

Coffey: I took the whole conversation to mean he needed assets to get the company listed in Standard and Poors and that was the easiest way to do it, create those and I'd be flexible to do whatever I wanted with them, down the road.

*Id.* at 690–91.

Q (by Mr. Lane for Defendant Gundersen): Well, on this tape on April 26th, doesn't Brent Gundersen also talk to you about putting cash into the corporation?

Coffey: He talks about putting assets into the corporation.

Q: Doesn't Brent Gundersen specifically say—and I refer to page 38—"Yeah, if we put a note, that's what I've been doing. Usually you put a promissory note with a little cash in there," is that correct?

\*   \*   \*   \*   \*   \*

Q: So he's—is this bogus cash or is this real cash he's talking about, in your estimation?

Coffey: We talked about assets and other connections there, too. I understood that, no, they didn't have to be legitimate....

*Id.,* Vol. 34 at 14.

Q (by Mr. Lane for Defendant Gundersen): You tell me if you can't answer this with a yes or no, and then we'll proceed from there. But let me just ask you very simply, aren't you telling Brent Gundersen that you've got investors coming from different states, and so because of that fact, you're concerned about where Standard & Poors covers, yes or no? Isn't that what

you're telling Brent Gundersen, in essence?

Coffey: When you say "in essence," sir, it's not a yes or no question. I say those words. The reason I have difficulty with it is I don't think I conveyed that these were legitimate, true investors in the common sense.

Q: I see. So what you're in essence saying, then, is that Brent should have known that these investors you're talking about were bogus, phony investors, and they weren't real people; is that it?

Mr. Rafferty (for the government): Your Honor, what Mr. Gundersen should have known is speculation on the part of the agent. I object.

*Id.*, Vol. 35 at 862–63.

Q (by Ms. Bradley for Defendant Graulich): And [Sneed] says, "All we have to do is each market-maker"—he's going—that he's going to be supplied with the 215 forms and then the other market-makers just all submit their 215 forms, right?

Coffey: Correct, something to that effect.

Q: There's nothing illegal about that, is there?

Coffey: He's talking about circumventing a rule. I understood that in some fashion, he was violating or breaking a regulatory rule, is the impression he had given me.

Q: Do you think—do you think it's illegal for—well, do you think it's improper—

Rafferty (for the government): Your Honor, I object. Pardon me, Ms. Bradley. I object to what this agent thinks.

*Id.*, Vol. 38 at 1106.

From this record, Coffey was asked by defense counsel to clarify conversations which were on tape. The taped conversations were not clear and unambiguous statements. In light of the complex transactions involved here, Coffey's opinions were helpful to the jury in order for the jurors to get a clear understanding of Coffey's remarks. Further, the record does not show that Sneed was acting as a government agent as part of the sting operation. Accordingly, we hold that the district court did not abuse its discretion in allowing such testimony.

Moreover, it is clear that Coffey's opinion testimony was solicited by defense counsel. We also note that, at least on two occasions, the prosecution objected to this questioning. After using this unorthodox method of cross-examination, the defense cannot now successfully claim that the district court should have policed this witness's answers more thoroughly.

## V.

Sneed was sentenced to 33 months imprisonment, 3 years supervised release, and was fined $15,000 with a special assessment of $200.00 for the convictions of aiding and abetting securities, mail, and wire fraud.

## A.

■ Sneed argues that the sentence imposed was improper as a matter of law because the district court failed to follow the statutory and precedential procedures established for application of the 1988 United States Sentencing Guidelines (Guidelines).

The district court applied U.S.S.G. § 2F1.1 (Nov. 1988). From a base offense level of 6, the district court added 2 levels for the offense characteristic of more than minimal planning pursuant to U.S.S.G. § 2F1.1(b)(2) and 4 levels for his leadership role in the offense pursuant to U.S.S.G. § 3B1.1(a) (Nov. 1988). The district court applied the "zero" loss adjustment pursuant to U.S.S.G. § 2F1.1(b)(1) because, under this sting operation, there could be neither actual loss to real victims nor true intended loss. Under the authority of U.S.S.G. § 2F1.1 comment (n. 9) (Nov. 1988) ("Dollar loss often does not fully capture the harmfulness and seriousness of the conduct. In such instances, an upward departure may be warranted."), the district court ruled that because Sneed had negotiated for and anticipated receiving $147,000, this amount would be used to justify a 6 level upward departure. Based on the final adjusted offense level of 18, the district court imposed the maximum sentence of 33 months.

Sneed maintains that the 6 level upward departure pursuant to U.S.S.G. § 2F1.1, Comment (n. 9) (Nov. 1988) was improper

because the court failed to identify specific aggravating circumstances which were not taken into consideration by the Guidelines, failed to adequately state the reasons for the departure, failed to properly apply the Guidelines, and failed to follow the mandates of certainty and fairness set forth by Congress. Sneed argues that the district court's departure based on either anticipated gain to Sneed or nonexistent loss to an offshore bank is contrary to law and must be reversed because the Guidelines do not speak to hypothetical criminal offenses.

The government argues that the district court should have enhanced Sneed's sentence based on intended loss, rather than determining that "the correct loss in an undercover 'sting' operation ... is zero." *Sneed,* 814 F.Supp. at 970–71.

In *United States v. Galbraith,* 20 F.3d 1054, 1058–60 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 233, —— L.Ed.2d —— (1994), we specifically endorsed the approach used by the district court in *Sneed.* Accordingly, we agree that the intended loss here is zero and will examine only the upward departure under U.S.S.G. § 2F1.1, comment (n. 9) Nov. 1988.

■ We review the district court's upward departure in three steps. *United States v. Tisdale,* 7 F.3d 957, 961 (10th Cir. 1993), *cert. denied* —— U.S. ——, 114 S.Ct. 1201, 127 L.Ed.2d 549 (1994). First, we determine whether the circumstances cited by the district court warrant a departure from the Guidelines as a matter of law. Second, we review the court's factual determinations underlying the asserted justification for departure to determine if they are supported by the record. Third, we determine whether the degree of departure is reasonable. *Id.;* *see* 18 U.S.C. § 3742(e).

In *Sneed,* the district court ruled:

In applying the fraud guideline, I have concluded that the proper loss figure for a "sting" operation, structured as this one was, is zero. I have done so largely on the premise that there was never any possibility of a real loss to a real victim and that use of a fictional loss figure invented largely by Government agents would effectively permit them to set the loss figure. I nonetheless recognize that a figure of zero is almost as fictional, in terms of defendants' culpability, because it attributes the same level of loss to this intricate, carefully-executed scheme as I would attribute to a bank teller who embezzled $500 from his or her cash drawer on a single occasion. While other guideline adjustments (more than minimal planning, for example) may account for part of the difference in the two situations, I still think some degree of departure is required to account for the seriousness of these defendants' conduct. *Sneed,* 814 F.Supp. at 979.

We agree. Therefore, under step one, sting operations which expose fraud are not adequately addressed in the Guidelines because the result is an intended loss of zero. A zero loss does not adequately address the seriousness of Sneed's conduct as a matter of law.

Under the second step, we review the court's factual determinations underlying the asserted justification for departure to determine if they are supported by the record. Here, the district court's justification for an upward departure is the seriousness of Sneed's conduct. In the record, there is evidence that Sneed was involved in the entire scheme from the beginning, that he located a shell company, arranged for a company to "pink" the stock, prepared Monarch's business plan, recruited marketmakers and brokers, prepared a schedule of trading, and directed the actual trading. Though Sneed received a separate enhancement for his role in the offense, in light of the Guidelines failure to adequately address "loss" under this sting operation, there is sufficient evidence in the record to support the district court's justification for upward departure.

Under the third step, we determine whether the degree of departure is reasonable. The district court reasoned:

Assuming that the facts here warrant a departure from the guidelines, the remaining issue concerns the degree of departure. Because the rationale for departure is rooted in the inadequacy of the calculated loss figure to reflect the seriousness of defendants' conduct, I believe the degree

of departure must be explained in terms related to the concept of loss. I have already concluded that the loss figures preferred by the parties were either wholly unintended or wholly unrealistic. The amount of the bank loan, for example, was determined by the Government, not defendants; as a practical matter, defendants (especially Mr. Gundersen and Mr. Graulich) were undoubtedly indifferent concerning the amount or terms. Their main concern was the money they were to receive in the scheme. This was a negotiated amount. Defendants had at least as much input into the figure as the Government. Indeed, the Government's incentive was to negotiate hard for a lower amount; the defendants', for a higher amount. There is some justice in saying that each defendant should be stuck with the amount he negotiated for himself, even though the overall harm could never be accomplished. In fact, Mr. Gundersen and Mr. Graulich received the bulk of the fixed sum for which they bargained. Mr. Sneed did not and could not, given the impossibility of the scheme and the fact that he had hitched his wagon to it, but that was what he negotiated. I view Mr. Sneed's conduct as substantially more culpable than Mr. Gundersen's or Mr. Graulich's precisely because he bargained for a percentage arrangement that gave him a direct economic interest in seeing that the scheme succeeded. His greater anticipated share of the intended profits reflects that greater culpability.

*Id.* at 979–80.

We agree and hold that the amount of the upward departure was reasonable based on the rationale used by the district court.

Sneed also argues that the district court's departure based on a nonexistent loss to an offshore bank is contrary to law and must be reversed because the Guidelines do not speak to hypothetical criminal offenses. However, taking Sneed's argument to its conclusion, no individual convicted in a sting operation could be sentenced under the Guidelines because, in essence, all sting operations are hypothetical criminal offenses.

Further, Sneed argues that the case of *United States v. Haddock,* 12 F.3d 950 (10th Cir.1993) prevents the use of anticipated gain as a measure of loss. In *Haddock,* we stated that "enhancement is only for loss to victims, not for gain to defendants. The defendant's gain may be used only as an 'alternative estimate' of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." *Id.* at 960. However, *Haddock* addressed comment (n. 8) to U.S.S.G. § 2F1.1 and did not involve a sting operation. Here, the district court properly used the $147,000 anticipated gain merely as a gauge to measure the seriousness of Sneed's conduct under U.S.S.G. § 2F1.1, comment (n. 9). We affirm the district court's upward departure of Sneed's sentence.

**B.**

■ Sneed argues that the $15,000 fine imposed was clearly erroneous because his Presentence Report recommended that no fine be imposed because of his inability to pay.

■ We review the imposition of the $15,000 fine for plain error because Sneed did not object to the fine at sentencing. *United States v. Burson,* 952 F.2d 1196, 1202 (10th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1702, 118 L.Ed.2d 411 (1992).

■ U.S.S.G. §§ 5E4.2(a) and (f) (1988) mandate a fine except where the defendant establishes that he is unable to pay and is not likely to become able to pay the fine. In deciding the amount of a fine, the Guidelines require the court to consider any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources. U.S.S.G. § 5E4.2(d)(2) (1988). Neither express written nor oral findings on this issue are required. *Burson,* 952 F.2d at 1203. Compliance with § 5E4.2 merely requires the record to reflect that the district court considered the pertinent factors before it imposed the fine. *See United States v. Washington–Williams,* 945 F.2d 325, 328 (10th Cir.1991)

(addressing U.S.S.G § 5E1.2, the successor "Fines for Individual Defendants" section).

Here, the record of the sentencing hearing establishes that the district court considered Sneed's ability to pay in setting the amount of the fines. Recognizing that Sneed was without substantial assets and therefore unable to pay the full fine immediately, the court concluded that Sneed had earning capacity sufficient to pay the fine over time during his period of supervised release. (Appellant's App., Vol. 51 at 230–31). *See United States v. Blanchard,* 9 F.3d 22, 26 (6th Cir.1993) (court has duty to impose fine when no proof is submitted by the defendant on his likelihood to regain earning capacity). Accordingly, because the fine table in § 5E4.2(c)(3) allows for a fine of $15,000 for the offense level of 18, the district court's imposition of the fine did not constitute plain error.

**AFFIRMED.**