UNITED STATES of America,
Plaintiff,

v.

Paula B. BOYD, Defendant.

No. 00–40024–20–SAC.

United States District Court,
D. Kansas.

Sept. 4, 2001.

---

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case is before the court on the defendant Paula Boyd's motion to dismiss based on due process violations or in the alternative, to quash arrest, suppress tangible evidence and inculpatory statements and request evidentiary hearing (Dk.530). After reviewing the defendant

Boyd's arguments and authorities cited in support, the court believes oral argument would not materially assist it in deciding the motion. The court also denies the request for an evidentiary hearing, as the defendant's motion lacks the legal and factual merit necessary to warrant a hearing. The court does grant Charles William Hopkins' specific motion to join (Dk.578) on the conditions expressed in the court's Criminal Procedural Guidelines § I, ¶ F.

## BACKGROUND

The defendant Paula Boyd is charged in count one of the indictment with conspiracy to manufacture and distribute controlled substances (including methamphetamine), in violation of 21 U.S.C. § 846 and in counts two through five with distributing the list I chemical, pseudoephedrine, knowing or having reasonable cause to believe that it would be used to manufacture a controlled substance, in violation of 21 U.S.C. §§ 841(d)(2) (2000). The charges apparently stem from her involvement with the co-defendant Timothy Cline and the store, Biker's Dream, that he owned and operated.

In support of her motion, the defendant Boyd offers a factual background that is largely uncontroverted for purposes of this motion. Paula Boyd managed Biker's Dream which sold, *inter alia*, motorcycles, parts and paraphernalia for motorcycles, pills advertised to provide energy and help with diets, and pseudoephedrine. Biker's Dream was a target in the government's two-year investigation, titled "Operation Renegade," into methamphetamine production and distribution in Southeast Kansas.

Citing the search warrant affidavit prepared by Special Agent Ryan and the reports rendered by other officers, the defendant's memorandum recounts some of the government's investigation into Tim Cline and Biker's Dream. On March 1, 2000, Task Force Officer (TFO) Mark Rokusek entered Biker's Dream and made an undercover purchase of 40 bottles of pseudoephedrine, containing sixty tablets (60 m.g. each tablet) from Tim Cline, and the next day he purchased another eighty bottles from Cline at Biker's Dream. On March 7, 2000, Officer Rokusek telephoned Tim Cline at Biker's Dream and arranged for a purchase of pseudoephedrine to occur in two days.

On March 9, 2000, two undercover officers purchased 120 bottles of pseudoephedrine from Paula Boyd and Tim Cline. According to the facts as proffered by the defendant and cited from Officer Rokusek's report, the officers entered Biker's Dream and spoke with a heavy set white male employee who said Cline was there, but busy. When told that "60 count" was available, Officer Rokusek asked whether the female (Paula Boyd) at the front counter could handle the deal, and the male employee approved. Officer Rokusek approached defendant Boyd and learned from her that "60 count" pseudoephedrine was available and that he could purchase eight bottles at a time. Officer Rokusek, however, paid for and received sixteen bottles each time by telling Boyd that eight of the bottles were for Officer Buck. Boyd packaged eight bottles in each bag and told Officer Rokusek that they each had to carry one bag out of the store. Officers Rokusek and Buck left and returned in ten minutes to purchase another sixteen bottles, and continued this pattern of purchases over a seventy-five (75) minute period. During these transactions, Officer Buck mentioned a figure of 120 bottles. At some point, Cline presented himself, greeted Officer Rokusek, and brought forward several boxes of pseudoephedrine from the rear of the store to defendant Boyd. Cline was present during many of the transactions.

## ARGUMENT

The defendant argues that absent some reasonable indication or individualized suspicion that she was likely to engage in illegal sales of pseudoephedrine, the government violated the Due Process Clause in targeting her during Operation Renegade. She denies ever being a drug user or being involved in any way, intentionally or consciously, in the illicit drug business. The defendant paints herself as simply a loyal employee of Biker's Dream on March 9, 2000, who was concerned with the store's sale of merchandise and proceeded to conduct the transactions in compliance with her employer's instructions about the "8 bottle limit." The defendant contends undercover officers induced her to violate federal law while knowing that she had not been informed of the relevant federal regulations governing such sales. Referring to the Comprehensive Methamphetamine Control Act of 1996, the defendant insists the government was obligated after the earlier undercover purchases to send a warning letter to Biker's Dream that included a mandate to educate employees about legal sales of pseudoephedrine. Because no such letters were sent, the defendant assumes the undercover officers knew the defendant was not knowledgeable about those regulations and, thus, induced her to sell large quantities of pseudoephedrine.

Summarizing the federal controlled substance law applying to pseudoephedrine, the government concludes that retail distributors are subject to registration, record-keeping and reporting requirements if they sell more than 24 grams of pseudoephedrine in a single transaction. The government points to the notes accompanying 21 U.S.C. § 802 that include a federal regulation on "Retail Sales of Certain Precursor Chemicals: Effect on Thresholds; Combination Ephedrine Products." This regulation references the warning letter and employee education requirements that the defendant cites in support of her argument. The government explains such requirements are only conditions to the civil penalties addressed and authorized in the same regulation. The government cites case law rejecting the argument advanced here that the government must have a reasonable basis or reasonable suspicion of wrongdoing before conducting an undercover investigation. The government also addresses the defendant's allegations under the outrageous government conduct defense.

## DISCUSSION AND HOLDING

### *Individualized Suspicion*

The defendant's opening salvo is that "[t]he Due Process Clause requires some individualized suspicion before the government may target a person for an undercover 'sting' operation." (Dk.531, p. 14). Having no direct authority to support this purported constitutional requirement, the defendant pins her hopes on Justice Brandeis' dissenting opinion in *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928), on general Fourth Amendment requirements for an arrest or traffic stop, and on the Third Circuit decision of *United States v. Twigg*, 588 F.2d 373, 381 n. 9 (3rd Cir.1978) [1] (government's

---

1. The Tenth Circuit in *United States v. Diaz*, 189 F.3d 1239, 1245 (10th Cir.1999), *cert. denied*, 529 U.S. 1031, 120 S.Ct. 1448, 146 L.Ed.2d 334 (2000), observed this circuit's "non-utilization" of the outrageous government conduct doctrine and quoted from *United States v. Tucker*, 28 F.3d 1420, 1426 (6th Cir.1994), *cert. denied*, 514 U.S. 1049, 115 S.Ct. 1426 (1995), including this critical comment about *Twigg:* "The only case squarely holding that an objective assessment of the government's conduct in a particular case may bar prosecution without regard for the defendant's predisposition [*United States v.*

involvement was "outrageous" where the agent supplied the necessary ingredient, purchased almost all of the other supplies, established the lab, and was the only person with knowledge necessary to manufacture methamphetamine).

■ The law is well settled that Due Process principles do not limit undercover operations to targets for which there exists individualized suspicion:

> The government is no more required to establish probable cause, or even a lesser degree of cause such as reasonable suspicion, before launching a sting operation than it is required to establish probable cause or reasonable suspicion in order to employ an undercover agent to worm his way into the confidence of persons suspected (whether or not reasonably) of being criminal in order to obtain evidence of their criminal activity.... Indeed a sting operation is merely a theatrically elaborated method of deploying undercover agents in criminal investigations.

*United States v. Hollingsworth,* 9 F.3d 593, 596–97 (7th Cir.1993) (citations omitted); *see United States v. Harvey,* 991 F.2d 981, 990 (2nd Cir.1993) ("The federal appellate courts that have considered this issue all appear to have concluded that the Constitution does not require either a reasonable basis or reasonable suspicion of wrongdoing by a suspect before the government can begin an undercover investigation of that person."); *United States v. Gamble,* 737 F.2d 853 (10th Cir.1984) ("We have held that the government need not have a reasonable suspicion of wrongdoing in order to conduct an undercover investigation of a particular person." (citations omitted)). Indeed, the concept of "individualized suspicion" drives Fourth Amendment analysis related to searches and seizures and not due process analysis:

> The requirement that police activity be based on individualized suspicion, however, is directly rooted in the Fourth Amendment's prohibition on unreasonable searches and seizures, *see, e.g., Terry v. Ohio,* 392 U.S. 1, 9, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (relying on the Fourth Amendment right "personal security"), and the Supreme Court has routinely upheld suspicionless police activity where no Fourth Amendment interests are implicated, *see, e.g., Michigan v. Chesternut,* 486 U.S. 567, 576, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (upholding suspicionless pursuit of individual where pursuit did not constitute a seizure under the Fourth Amendment). As such, there is no basis for imposing a requirement of individualized suspicion on law enforcement officials for undercover investigations implicating no Fourth Amendment concerns. (Citations omitted).

*United States v. Chin,* 934 F.2d 393, 397 (2nd Cir.1991). Under the weight of this compelling precedent, the defendant's arguments for an individualized factual predicate to a government's undercover operation crumble.

### Outrageous Government Conduct

■ First enunciated in *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), this defense recognizes that there may be those extremely rare situations " 'in which conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction....' " *United States v. Mosley,* 965 F.2d 906, 909 (10th Cir.1992) (quoting *Russell,* 411 U.S.

*Twigg,* 588 F.2d 373 (3d Cir.1978), cited extensively by Mr. Diaz] has been greatly criticized, often distinguished and, recently, disavowed in its own circuit."

at 431–32, 93 S.Ct. 1637). The burden is with the defendant to prove this defense. *United States v. Diaz,* 189 F.3d 1239, 1245 (10th Cir.1999), *cert. denied,* 529 U.S. 1031, 120 S.Ct. 1448, 146 L.Ed.2d 334 (2000). The burden is a difficult one for it " 'is an extraordinary defense reserved for only the most egregious circumstances. It is not to be invoked each time the government acts deceptively or participates in a crime that it is investigating. Nor is it intended merely as a device to circumvent the predisposition test in the entrapment defense.' " *United States v. Sneed,* 34 F.3d 1570, 1577 (10th Cir.1994) (quoting *Mosley,* 965 F.2d at 910). " '[T]o prevail, the defendant must show that the challenged conduct violated notions of fundamental fairness and is shocking to the universal sense of justice.' " *United States v. Diaz,* 189 F.3d at 1245 (quoting *United States v. Pedraza,* 27 F.3d 1515, 1521 (10th Cir.1994) (quotations omitted), *cert. denied,* 513 U.S. 941, 115 S.Ct. 347, 130 L.Ed.2d 303 (1994)).

■ As identified in *Mosley,* the two factors central to the Circuit's analysis of this defense have been "government creation of the crime and substantial coercion." 965 F.2d at 911; *United States v. Sneed,* 34 F.3d at 1577. Government creation of the crime is the result of excessive government involvement in bringing about the criminal conduct or in inducing the defendant to become first involved. *United States v. Sneed,* 34 F.3d at 1577. The Tenth Circuit has described government involvement as excessive "when the government engineers and directs the criminal enterprise from start to finish and the defendant contributes nothing more than his presence and enthusiasm." *Id.* (citations omitted). Coercion "must be particularly egregious" to sustain this defense, for officers may employ artifice, deception, and even threats and intimidation within the limits appropriate to the undercover operation. *United States v. Mosley,* 965 F.2d at 912.

■ The defendant is unable to allege any facts in this case which make the government conduct more outrageous than what has been held as not outrageous in Tenth Circuit decisions. *See, e.g., United States v. Diaz,* 189 F.3d at 1245–46; *United States v. Diggs,* 8 F.3d 1520, 1524–25 (10th Cir.1993). Posing as persons who wanted to purchase large quantities of pseudoephedrine, the undercover agents returned on March 9, 2000, to Biker's Dream where they had twice purchased numerous bottles of pseudoephedrine. It is not excessive government involvement "to infiltrate an ongoing criminal enterprise" or "to induce a defendant to repeat or continue a crime or even to induce him to expand or extend previous criminal activity." *Mosley,* 965 F.2d at 911. Upon being told that Tim Cline was unavailable, the agents simply asked whether someone else at the store could help them with their purchase. The defendant Boyd was handling the front counter of the store and appeared knowledgeable to the agents about handling the sale of large quantities of pseudoephedrine. The court finds nothing in these circumstances to indicate excessive government involvement in bringing about the illegal sales of pseudoephedrine or in making the purchases through the defendant. By advising the agents about the store's supply of pseudoephedrine and the proper manner for completing their large purchase and then handling the multiple sales, the defendant offered much more than her presence and enthusiasm in completing the sales. Not a mere employee nor a recent hire, the defendant was the manager of Biker's Dream, a position of trust and knowledge that appears incompatible with the defendant's pleas of ignorance. For that mat-

ter, the defendant's efforts at proving lack of knowledge based on the government's failure to provide warning letters or to mandate education about legal sales of pseudoephedrine may be arguments for trial,[2] but they do not establish any duties upon the government which if violated would create due process problems for this criminal prosecution. Finally, the defendant alleges nothing even suggestive of coercion, let alone egregious coercion. On the facts as have been presented and alleged, the court concludes the government's conduct is not outrageous and falls far short of the fundamental unfairness that violates the Due Process Clause.

IT IS THEREFORE ORDERED that the defendant Paula Boyd's motion to dismiss based on due process violations or in the alternative, to quash arrest, suppress tangible evidence and inculpatory statements and request evidentiary hearing (Dk.530) is denied;

IT IS FURTHER ORDERED that Charles William Hopkins' specific motion to join (Dk.578) is granted on the conditions expressed in the court's Criminal Procedural Guidelines § I, ¶ F.

---

**2.** As argued by the government, the federal regulations described in the note to 21 U.S.C. § 802 and cited by the defendant do not appear to bear upon the government's ability to bring a prosecution under 21 U.S.C. §§ 841(d)(2) and 846. The court has not been presented with any authority for the proposition that the government's failure to provide notice in accordance with the civil regulatory provision has any effect on the government's ability to charge and prosecute a defendant for these offenses.