**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 26 1998**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

SUZANNE BARBARA SCHURRER,

Defendant-Appellant.

No. 97-1184
(D.C. No. 96-CR-362-Z)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO, HOLLOWAY,** and **TACHA,** Circuit Judges.

Defendant-appellant, Suzanne Schurrer, appeals her conviction following trial by jury on multiple counts of mail and wire fraud and the filing of two false income tax returns. Specifically, Ms. Schurrer raises the following issues for review: (1) whether the district judge erred in denying Ms. Schurrer's fourth motion to continue trial, (2) whether the judge erred in allowing testimony from a representative of the victim that Ms. Schurrer was suspected of embezzlement, and (3) whether the judge erred in allowing a government

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

witness to testify as an expert in the area of risk management.[1]  We have jurisdiction under

28 U.S.C. § 1291 and affirm.

**I**

There was evidence at trial tending to show the following facts.  Suzanne Schurrer

was hired by Katy Industries in 1989 or 1990 to work in the area of risk management and to

develop a program for employee benefits.  R. Vol. 5 at 502.  Katy is a "mini conglomerate"

that buys and sells companies, and it specializes in consumer, industrial and machinery

manufacturing.  R. Vol. 2 at 3.   Ms. Schurrer was hired to expand the risk management

function of the company and administer employee benefits.  R. Vol. 5 at 504.  As part of her

job duties, Ms. Schurrer examined requests for payment made by other businesses that

provided certain services to Katy.  Id. at 504-505.  When an invoice was submitted to Katy

that pertained to the area of risk management or insurance, it was passed to Ms. Schurrer for

initial review and approval to confirm that the work had been done.  Once Ms. Schurrer

approved the request for payment, it was sent to Katy's accounting department for

confirmation that a contract was in place and that the obligation is legitimate.     [2]  Once

confirmed as properly payable, a check would be issued and forwarded to authorized signers.

---

[1]One other issue was presented in Ms. Schurrer's opening brief on appeal, which alleged error in the trial judge's refusal to allow a certain defense exhibit into evidence. However, this issue was expressly withdrawn at oral argument and will not be considered.

[2]Before contracts with outside businesses were executed, however, the proposed contracts would first be sent to Katy's legal counsel.  If approved, the contract would be executed by authorized personnel at Katy.  R. Vol. 5 at 505-506.

Id. at 505.

The indictment charged that Ms. Schurrer engaged in a scheme of submission of several false and fraudulent invoices on behalf of an outside business by the name of Am Ins Group, to Katy from about April 15, 1994, to about May 3, 1996. Vol. 1 Tab 1. In explaining these invoices to Katy personnel, Ms. Schurrer represented that Am Ins Group was doing some research work for Katy in the area of insurance. R. Vol. 2 at 115.

The scheme began with an invoice received by Katy in April 1994, purporting to be from Am Ins Group, a New York company, [3] and requesting payment in the amount of $79,298. Appellee Addendum (Aple. Add.) at 1. The invoice indicates that the amount due reflects a 10% commission charged by Am Ins Group and it contains a crossed-out request that payment be sent to an employee at Am Ins Group's Chicago office.[4] Id. In lieu of this instruction, the invoice contains a hand-written direction: "Sue for hand delivery w/contract." Id. Additionally, the invoice contains "OK 5/4/94 SS," Sue Schurrer's initials. R. Vol. 2 at 95. Katy paid the invoice on May 11, 1994, by check. Aple. Add. at 3, 32. Ms. Schurrer admitted receiving the $79,298 check, R. Vol. 6 at 698; R. Vol. 5 at 644, which was later

---

[3]The invoice indicates that Am Ins Group is located at 70 Pine St. in New York City. However, that address actually belongs to American International Group, Inc., which has never been affiliated with, or known as, Am Ins Group. R. Vol. 3 at 409. American International Group is a legitimate insurance company that had sold insurance to Katy. R. Vol. 2 at 7-8.

[4]The remittance address appearing on the invoice in Chicago actually belongs to American International Group, Inc. As noted above, this company has no affiliation with Am Ins Group. R. Vol. 3 at 409.

deposited at NBD Bank on May 13, 1994. R. Vol. 3 at 326-327. An account there had been opened in the name of Am Ins Group. Id.[5]

In January 1995, Katy again received an invoice purportedly from Am Ins Group requesting payment in the amount of $174,880.80, for services allegedly rendered. Aple. Add. at 4. This invoice similarly contains: "OK 2/7/95 . . . SS," indicating that Ms. Schurrer approved its payment. Id.; R. Vol. 2 at 95. Also contained on the invoice is a post-it note, authored by Ms. Schurrer, which states, "Return check to Suz asap for courier pick-up. SS." Id. Katy again issued a check, payable to Am Ins Group, in the requested amount on February 7, 1995, Aple. Add. at 5, and the check was delivered directly to Ms. Schurrer. R. Vol. 3 at 202-03. The check was deposited into an account opened in the name of Am Ins Group at First Bank of Arapahoe County. R. Vol. 3 at 335.

A similar Am Ins Group invoice was again submitted to Katy in April 1995. Aple. Add. at 6. As with the prior invoices, Ms. Schurrer's approval for payment is indicated on the invoice, along with her initials, with instructions to deliver payment directly to her. Id. Katy subsequently issued a check payable to Am Ins Group in the requested amount ($165,780.30) in May 1995, id. at 8, and the check was given to Ms. Schurrer. R. Vol. 3 at 202. This check was deposited into the Am Ins Group account at First Bank of Arapahoe

---

[5]The first deposit into this NBD account was made on May 2, 1994, in the amount of $1,180.55. This deposit was a check payable to Ms. Schurrer and issued by Katy. R. Vol. 3 at 326. The check for $79,298 payable to Am Ins Group was the second deposit made into this NBD account. Id. at 327.

County. R. Vol. 3 at 335.

In May 1995, Katy terminated Ms. Schurrer's employment. R. Vol. 2 at 135-136. This termination, however, was not prompted by Ms. Shurrer's fraudulent activities, which were unknown to Katy at the time. Following her termination, Ms. Schurrer continued a limited business relationship with Katy by entering into a consulting agreement. Under this contract, Ms. Schurrer agreed to assist with Katy's insurance filing system on an "as-needed" basis. Id. at 136-137.

In July 1995, Katy received another invoice purportedly from Am Ins Group. Aple. Add. at 9. The invoice directed payment to be sent to Am Ins Group's lockbox at an address in Greenwood Village, Colorado.[6] Ms. Schurrer again approved payment by initialing the $182,843.90 invoice. Aple. App. at 9. Katy paid the invoice in three installments over a three-month period by mailing checks to the designated lockbox. Aple. Add. at 10-15. Each check was deposited into the Am Ins Group account at First Bank of Arapahoe County. R. Vol. 3 at 335. This formed the basis for counts one to three of the indictment against Ms. Schurrer, charging mail fraud.

In March 1996, Ms. Schurrer telephoned Katy and advised that she had received a "past-due" invoice from Am Ins Group requesting final payment in the amount of $397,198, to be paid in two separate, equal installments. Aple. Add. at 51-55. Ms. Schurrer then sent

---

[6]It was later learned that this lockbox was actually owned by Mail Boxes Etc. The box had been rented to Ms. Schurrer, acting as agent for Am Ins Group, in July 1995. R. Vol. 3 at 249, 252-253.

by facsimile a detailed letter, with a copy of the invoice, to Katy explaining the items discussed during the telephone conversation. Id. In the letter, Ms. Schurrer advised that Am Ins Group and Katy had entered into a contract for services in 1991, with a negotiated fee ranging between $250,000 and $1 million, based on projected savings to Katy from Am Ins Group's services. Aple. Add. at 53.

A Katy representative by the name of Lisa Blackburn, [7] who was Ms. Schurrer's successor, R. Vol. 2 at 59, requested to meet with Ms. Schurrer regarding the latest Am Ins Group invoice.[8] Id. at 6-8. At the April 1996 meeting, Ms. Schurrer advised that Am Ins Group had saved Katy money on insurance premiums by recalculating an "experience modification factor." Id. at 18-20. Ms. Schurrer then indicated that she had given Am Ins Group her word that the invoices would be paid under the agreed payment plan. Id. at 20-21. Blackburn, in need of verification and documentation in order to approve the payment, asked to see the contract which Katy and Am Ins Group purportedly executed. Id. at 21-22.

Ms. Schurrer subsequently arranged with a personal friend in Arkansas, Errol Trobee, in April 1996 to act as an Am Ins Group agent in her attempt to collect on the invoice. R. Vol. 3 at 342-343. Trobee testified that Ms. Schurrer informed him in their telephone

---

[7]Lisa Blackburn was known as Lisa Hodes prior to July 1996.

[8]Apparently, Ms. Schurrer's successor, Lisa Blackburn, became increasingly suspicious after receiving the final Am Ins Group invoice. She testified that because so much money was claimed to be due, she had to "verify [the] account for [herself] to be able to approve the payment." R. Vol. 2 at 60. As discussed above, Ms. Schurrer's former position at Katy, which Blackburn filled after Ms. Schurrer's termination, involved examination into the legitimacy of all invoices received.

conversation that Am Ins Group was a company that she had set up, and that she wanted Trobee to disguise her role in Am Ins Group. Id. at 343-344. After obtaining Trobee's consent to participate in the scheme, Ms. Schurrer prepared and sent by facsimile a false request to Trobee asking that he forward a copy of the Katy-Am Ins Group contract to Katy Industries; a copy of this request was also faxed to Katy. Aple. Add. at 23. Using Trobee's name as agent for Am Ins Group and reprogramming her fax machine to reflect Trobee's Arkansas fax number on the transmission, Ms. Schurrer then prepared and sent by facsimile on May 3, 1996, from her home in Colorado a false contract and other false documentation to Katy. R. Vol. 3 at 345-346.

Upon reviewing the materials submitted to Katy regarding Am Ins Group, Blackburn, becoming increasingly suspicious, traveled on May 6, 1996, to the lockbox address appearing on the Am Ins Group invoice. R. Vol. 2 at 43. When asked the reasons behind her visit to the invoice address, Blackburn testified that "[a]fter looking over all the documentation [related to the Am Ins Group invoice], the whole situation looked very suspicious . . . for a number of reasons. And I was curious where we were paying . . . where this location was." Id. Blackburn discovered that the Am Ins Group lockbox was located at a Mail Boxes Etc. near Katy's offices. Id. at 44. Blackburn then attempted to contact Trobee, but since she did not have his telephone number, she sent a fax transmission to him asking that he contact her regarding the Am Ins Group invoice. R. Vol. 3 at 348.

In an effort to coach Trobee, Ms. Schurrer sent by facsimile "suggestions/information"

to use when speaking with Blackburn.[9]  R. Vol. 3 at 348-349.  Upon receiving Ms. Schurrer's instructions, Trobee unsuccessfully attempted to reach Blackburn by telephone on May 7, 1996.  R. Vol. 3 at 349.  However, Blackburn later telephoned Trobee on the same day and during the conversation, she pressed for further information, which Trobee was not prepared to give.[10]  Id. at 350.  Trobee reported this conversation to Ms. Schurrer, who said she would handle the situation, and he did not hear from her further.  Id.

Ms. Schurrer's scheme collapsed when law enforcement began investigating her activities in late May 1996.  However, during 1994 and 1995, Ms. Schurrer was able to defraud Katy out of $602,803, Aple. Add. at 32-42, which she did not report as income on her federal tax returns for the years 1994 and 1995.  Id. at 77-99.  This served as the basis for counts six and seven, charging the filing of false income tax returns.  R. Vol. 1 Tab 1.

A jury trial commenced against Ms. Schurrer in February 1997.  At trial, defendant Ms. Shurrer elected to take the stand.  She said she worked with Katy Industries from January 1991 to July 1995.  R. Vol. 5 at 596-97.  She gave testimony to explain the submission of the invoices to Katy and her receipt of funds in payment for them.  R. Vol. 6 at 666; R. Vol. 5 at 598, 625.  Her work was as an "assistant risk manager," she believed.  R. Vol. 5 at 598.  She testified that she made an agreement to render services to accomplish the reduction of

---

[9]This transmission served as the basis for count four, charging wire fraud.  R. Vol. 1 Tab 1.

[10]This telephone call served as the basis for count five, charging wire fraud.  R. Vol. 1 Tab 1.

liabilities of Katy to AIG, and that for these services she was to receive some ten percent of the reduction for herself, up to a "cap" of $1,000,000. R. Vol. 6 at 673. Ms. Shurrer denied that the invoices submitted to Katy were "phony." R. Vol. 6 at 722. She admitted receipt of funds in large amounts as a result of the invoices submitted to Katy with her approval for their payment. R. Vol. 6 at 698-99.

As to the tax returns in question, Ms. Shurrer denied any scheme to defraud the government. She said that in her mind the money she received was reported and the tax paid, but admitted that she failed to look at the tax return filed for 1994. R. Vol. 6 at 687. Ms. Shurrer explained that she thought that the tax liability would be satisfied from funds received with the payment of the last installment of payments to come from Katy. Id.

The jury trial resulted in Ms. Schurrer's conviction on all seven counts charged in the indictment. She was sentenced in May 1997 to 37 months' imprisonment, three years of supervised release, and she was ordered to pay $602,803 in restitution. R. Vol. 1 Tab 18.

## II

A. Motion for Continuance

Ms. Schurrer's trial date was originally set for November 12, 1996. R. Vol. 1 Tab 2. After three successful motions to continue the trial date, id. at Tab 19, pp. 4-5, which ultimately resulted in the trial being moved to February 24, 1997, Ms. Schurrer moved for a fourth continuance on February 14, 1997. Id. at Tab 11. Her sole reason for requesting this fourth continuance was that there had not been enough time to adequately prepare her

defense. Id. The trial judge denied this motion on February 21, 1997, by minute order. Id. at Tab 12. Ms. Schurrer now argues that the denial of her motion was prejudicial error requiring a new trial. She contends that she needed more time to gain access to certain records located at Katy, despite testimony from Katy officials that such records either did not exist or were not in Katy's possession. Among the records Ms. Schurrer sought was the original consulting contract on which she based the Am Ins Group invoices. The government witnesses said the "original contract" that defendant sought never existed. Aplt. Brief at 10-11.

"We review the denial of a motion to continue under an abuse of discretion standard . . . and will find error only if the denial was arbitrary or unreasonable and materially prejudiced the defendant." United States v. Wynne, 993 F.2d 760, 767 (10th Cir. 1993) (quotations and citations omitted). The following factors are relevant to this inquiry: (1) the diligence of the party seeking the continuance; (2) the likelihood that the continuance, if granted, would accomplish its underlying purpose; (3) the inconvenience to the opposing party, its witnesses, and the court resulting from the continuance; and (4) the need asserted for the continuance and the harm that appellant might suffer as a result of its denial. Id.

We do not find that the judge abused her discretion when she denied Ms. Schurrer's fourth motion for a continuance. As noted, the trial was initially set for November 1996. Following earlier successful motions to continue the trial, Ms. Schurrer was provided with three additional months in which to prepare her defense and locate necessary documents and

exhibits. The judge was apparently disinclined to permit Ms. Schurrer to further delay her trial in order to allow her to engage in some undefined search for documents, which Katy represented do not exist, and which a subpoena failed to produce.[11] There is no indication that, had the trial been continued, Katy would have found the documents for which Ms. Schurrer searched or that she would have otherwise been able to produce them. Moreover, there is no indication that the denial of her fourth motion to continue the trial actually prejudiced her defense or that the jury's verdict would have been different had the continuance been granted. We therefore find no error.

### B. The Blackburn Testimony

Ms. Schurrer complains that the judge also erred when she permitted a government witness, Lisa Blackburn, to testify about her suspicions with regard to the last Am Ins Group invoice. Specifically, Ms. Schurrer points to Blackburn being permitted to testify as to her "general conclusions" after reviewing the documents purportedly submitted by Am Ins Group through Ms. Schurrer. Blackburn testified that she reviewed the final Am Ins Group "past due" invoice, along with the supporting documentation and contract for services, in May 1996. R. Vol. 2 at 31. Blackburn was then asked about her conclusions after reviewing these

---

[11]We also note that Ms. Schurrer's fourth motion for continuance provided no firm reason for the request. The motion vaguely states that, "The Defendant submits that there has not been enough preparation time to adequately prepare the defense." R. Vol. 1 Tab 11. Without a more detailed, precise explanation serving as the basis for the request, the district judge understandably denied her motion. On appeal, Ms. Schurrer now claims that the reason behind the request was her desire to search for additional documents.

materials, to which defense counsel objected on the grounds of conclusion, opinion, conjecture and speculation. Id. at 33. The objection was overruled, and Blackburn testified that following her review of the materials, "The whole situation looked very suspicious to me." Id. at 33-34. Blackburn further testified that when she compared the Am Ins Group contract with the final invoice, "things didn't seem to match," and that the supporting documentation made no sense whatsoever. Id.

Later, during Blackburn's testimony on direct examination, Blackburn was again permitted to state her suspicions regarding the Am Ins Group invoice. Blackburn testified that she traveled to the lockbox address contained on the Am Ins Group invoice. The government then asked why she went to the address. Defense counsel objected to Blackburn being permitted to offer any conclusion or opinion. This objection was overruled, and Blackburn proceeded to testify that, "After looking over all the documentation that's in front of me . . ., the whole situation looked very suspicious . . . for a number of reasons. And I was curious where we were paying . . . where this location was." Id. at 43-44.

Additionally, during cross-examination, defense counsel asked Blackburn about the procedures involved in paying accounts payable. Id. at 76-77. Blackburn responded that there were two different procedures, and defense counsel asked her to describe both of them. Id. at 77. Blackburn proceeded to describe the procedure in place when she first began working at Katy. After describing this process, Blackburn stated: "That was when I first started. After we discovered what I would call 'embezzlement' --" Id. Defense counsel

-12-

promptly interrupted Blackburn, objected, and asked that the remark about "embezzlement" be stricken as a conclusion. The judge promptly sustained the objection and instructed the jury to strike the remark and to not consider it for any purpose. Id. at 77-78. Blackburn then testified that several internal controls were put in place "after this whole thing came up." Id. at 78.

Ms. Schurrer argues that Blackburn's testimony regarding her suspicions should have been excluded as legal conclusions under Fed. R. Evid. 701. Ms. Schurrer further maintains that Blackburn's reference to "embezzlement" was too prejudicial to be cured with an instruction to disregard. She contends that these alleged errors require a new trial. We disagree.

We review the trial court's evidentiary rulings under an abuse of discretion standard. United States v. Wilson, 107 F.3d 774, 780 (10th Cir. 1997). And, "the admission of lay opinion testimony [under Rule 701] is within the sound discretion of the trial court and will not be overturned on appeal absent a clear abuse of discretion." United States v. Sneed, 34 F.3d 1570, 1581 (10th Cir. 1994) (quoting United States v. Hoffner, 777 F.2d 1423, 1425 (10th Cir.1985)). Rule 701 provides, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." To the extent that the testimony regarding Blackburn's suspicions is opinion evidence, we are

satisfied that both qualifications are met here.

We agree with the government that Blackburn's testimony to the effect that she became suspicious after reviewing the final Am Ins Group invoice and supporting documentation was both rationally based on her own perceptions and helpful to the jury in understanding Blackburn's actions in requesting more documentation and engaging in further investigation into the legitimacy of the invoice. Blackburn's first statement, to which defense counsel objected, that she became suspicious following her review of the invoice and documentation, served to explain Blackburn's subsequent actions in seeking additional information and her desire to personally contact a representative of Am Ins Group, which, of course, led to her correspondence and communication with Trobee. Secondly, Blackburn's later testimony regarding her suspicions served as the basis for explaining why she went to the lockbox address contained on the Am Ins Group invoice. Additionally, it is clear that the statements regarding Blackburn's suspicions are not legal conclusions -- by stating her suspicions, Blackburn did not testify that Ms. Schurrer committed the crime of mail or wire fraud. The district court did not, therefore, abuse its discretion in permitting Blackburn to inform the jury that the Am Ins Group invoice and supporting documentation made her suspicious.

More troubling is Blackburn's unsolicited reference to "embezzlement," which was a clear reference to Ms. Schurrer's allegedly illegal conduct in submitting false invoices. However, we do not believe that this single statement, not solicited by the government and

made during cross-examination by defense counsel, constitutes reversible error, especially given the weight of other evidence against Ms. Schurrer. Moreover, pursuant to defense counsel's immediate objection and motion to strike, the judge promptly instructed the jury to strike the remark and not consider it. Naturally, some prejudice flowed from Blackburn's statement, notwithstanding the judge's admonition, but we do not believe that the prejudice is so great as to call into question the jury's verdict of guilt.

C. Expert Witness

Ms. Schurrer lastly asserts error in the trial judge's acceptance of government witness, Sue Gibson, as an expert in the field of risk management. After eliciting testimony from Gibson regarding her education, qualifications, and experience in the area of insurance and risk management, the government offered her as an expert in the field of risk management. R. Vol. 3 at 256-259. To this proffer, defense counsel stated that he did not desire to voir dire Gibson, but that it was the defense's position that the government failed to show that Gibson was qualified to be an expert witness. Defense counsel objected to foundation and adequacy of evidence related to Gibson's "experience, training, expertise, [and] knowledge of the issues in risk management." Id. at 259. Defense counsel also questioned whether the area of risk management can even be considered an area of independent expertise. When defense counsel declined to voir dire Gibson, the trial judge inquired as to whether Gibson had ever previously testified during a trial, to which she answered that she had not. Id. at 259-260. The judge then permitted Gibson to testify as an expert witness over

defense objection.  Id. at 260.

Once deemed an expert witness, Gibson proceeded to first define the area of risk management and then give her opinion as to the "validity" of the Am Ins Group invoices and the "contract" purportedly submitted by Am Ins Group through Trobee, but as noted earlier, actually sent by facsimile by Ms. Schurrer.  Id. at 261-263, 266-269.  More specifically, Gibson testified that she had been asked to analyze the Am Ins Group invoices and contract to determine their validity, and analyze the work that was performed on the invoices to determine whether it was in accord with the contract and Katy's insurance programs.  Id. at 267.  When asked about the conclusions she reached following her analysis, Gibson testified that the contract contained contradictions between the services provided and the compensation that was to be received, that the work performed on the invoices was not in line with Katy's insurance programs, and that therefore the commission stated on the invoices was not due.  Id.  Gibson essentially offered her opinion that the invoices and contract were not valid.

Ms. Schurrer argues that Gibson's testimony concerning the validity of the documents effectively usurped the function of the jury.  She contends that the trial court erroneously allowed Gibson to testify as to the ultimate issue of falsity or validity of documents that served as the key exhibits which the government used to prove its case.  Ms. Schurrer thus argues: "where the expert's 'opinion' was on the 'validity of the documents' which were the core of the case against defendant, the expert testimony took away the jury's function." Aplt.

Brief at 20. Ms. Schurrer further contends that Gibson, although experienced in the area of insurance, did not possess the requisite expertise to enable her to testify as to the validity of the documents. The government counters by arguing that Gibson's function was to enable the jury to understand the specialized, highly technical aspects of the documents, which are beyond the knowledge of most jurors, and to offer the jury the benefit of her analysis and expertise concerning these documents.

As with other evidentiary matters, "[w]e review a district court's admission of expert testimony for abuse of discretion. . . . Though under this standard, we will not reverse the district court without a 'definite and firm conviction that [it] made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances,' . . . reversal is appropriate when the court fails to consider the applicable legal standard for its discretionary judgment." United States v. Messner, 107 F.3d 1448, 1454 (10th Cir. 1997). Fed. R. Evid. 702 guides our analysis on this issue and provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

Here, in an effort to assist the jury in deciphering and understanding the invoices and documents purportedly submitted to Katy Industries by Am Ins Group, Aple. Add. at 1-31, 52-55, 57-62, the government called Gibson who had experience in the insurance and risk management field. She testified that she had been employed by a risk management services

-17-

firm for six years, worked previously as a casualty underwriter for an insurance company, possessed a bachelor's degree in finance, and has been specifically trained in the field of insurance and risk management. R. Vol. 3 at 256-259. In light of these qualifications, the district judge did not abuse her discretion in accepting Gibson as an expert witness.

Additionally, given the complex and technical nature of the documents submitted to the jury, Aple. Add. at 1-31, 52-55, 57-62, as well as the unique terminology, abbreviations, and codes contained therein, the district judge did not abuse her discretion in concluding that Gibson's expert testimony would be useful in assisting the jury "to understand the evidence or to determine a fact in issue." The average juror, being unfamiliar with the intricacies and terminology of the insurance and risk management business, is not likely to understand or appreciate, without assistance, the significance of, or meaning behind, the insurance and risk management-related documents offered into evidence by the government.

Moreover, the admission of Gibson's opinion testimony with respect to the validity of the invoices, contract and other documents was not reversible error. On the contrary, given the peculiar and technical nature of the language contained in these documents, as well as their overall degree of complexity, an average juror, unfamiliar with the insurance industry, is generally not capable of determining, on his own, whether such documents appear valid. Gibson's testimony therefore assisted the jury in determining a "fact in issue" under Rule 702, i.e., whether these documents were valid or spurious. Further, Fed. R. Evid. 704(a) specifically provides that, except as Rule 704(b) provides concerning an opinion or

inference respecting the mental state or condition of a defendant in a criminal case, "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Hence, Rule 704 permits an expert witness to provide his or her opinion on ultimate facts in circumstances like those before us. Whether these documents are valid is a question of fact, and Gibson's testimony to the effect that the documents are not valid was simply an expression of her opinion regarding this factual issue, based on her analysis.

Therefore the trial judge was not required to limit Gibson's opinion testimony to the pure technical aspects of the documents or to an explanation of the inconsistencies or errors she discovered within such documents; rather, it was proper to permit Gibson to go further and state her opinion that, because of these inconsistencies and inaccuracies, the documents do not appear to be valid. See United States v. Barbee, 968 F.2d 1026, 1031-32 (10th Cir. 1992) (testimony on ultimate factual questions permissibly aids the jury in reaching a verdict while testimony on ultimate questions of law usurps the jury's decision-making function). See also Specht v. Jensen, 853 F.2d 805, 810 (10th Cir. 1988) (en banc) ("In no instance can a witness be permitted to define the law of the case."), cert. denied, 488 U.S. 1008 (1989). It is clear that Gibson offered no opinion testimony concerning Ms. Schurrer's guilt or innocense, on whether the government proved the elements of the charged offenses, or on the credibility of the witnesses. Accordingly, we find no error.

**AFFIRMED**.

-19-

Entered for the Court


William J. Holloway, Jr.
Circuit Judge